Filed 3/16/21; Certified for Publication 4/6/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANTELOPE VALLEY GROUNDWATER CASES* | F082469 |
| REBECCA LEE WILLIS et al., | |
|     Plaintiffs and Appellants, | (JCCP No. 4408) |
|     v. | **OPINION** |
| LOS ANGELES COUNTY WATERWORKS DISTRICT NO. 40 et al., | |
|     Defendants, Cross-complainants and Respondents; | |
| CITY OF LOS ANGELES et al., | |
|     Defendants, Cross-defendants and Respondents; | |
| ANTELOPE VALLEY–EAST KERN WATER AGENCY, | |
|     Cross-defendant, Cross-complainant and Respondent; | |

---

\*_Los Angeles County Waterworks District No. 40 v. Diamond Farming Co._ (Super. Ct. Los Angeles County, No. BC325201); _Los Angeles County Waterworks District No. 40 v. Diamond Farming Co._ (Super. Ct. Kern County, No. S-1500-CV254348); _Wm. Bolthouse Farms, Inc. v. City of Lancaster_ (Super. Ct. Riverside County, No. RIC353840); _Diamond Farming Co. v. City of Lancaster_ (Super. Ct. Riverside County, No. RIC344436); _Diamond Farming Co. v. Palmdale Water Dist._ (Super. Ct. Riverside County, No. RIC344668); _Willis v. Los Angeles County Waterworks District No. 40_ (Super. Ct. Los Angeles County, No. BC364553); _Wood v. Los Angeles County Waterworks District No. 40_ (Super. Ct. Los Angeles County, No. BC391869).

U. S. BORAX INC. et al.,

    Cross-defendants and Respondents.

APPEAL from a judgment of the Superior Court of Los Angeles County. Jack Komar, Judge.[†]

Niddrie Addams Fuller Singh, David A. Niddrie, Victoria E. Fuller; The Kalfayan Law Firm, Ralph B. Kalfayan; and Gregory L. James for Plaintiffs and Appellants.

Mary Wickham, County Counsel, Warren R. Wellen, Deputy County Counsel; Best & Krieger, Eric L. Garner, Jeffrey V. Dunn, Wendy Y. Wang; Lagerlof, Thomas Bunn III; Murphy & Evertz, Douglas J. Evertz; Olivarez Madruga Lemieux O'Neill, W. Keith Lemieux; and Lynne Patrice McGhee for Defendants, Cross-complainants and Respondents.

Michael N. Feuer, City Attorney; Joseph Brajevich; Raymond Ilgunas; Kronick, Moskovitz, Tiedemann & Girard, Eric N. Robinson and Stanley C. Powell for Defendants, Cross-defendants and Respondents.

Richards, Watson & Gershon, James L. Markman and B. Tilden Kim for Cross-defendant, Cross-complainant and Respondent.

Venable, William M. Sloan, Tyler G. Welti; Kuhs & Parker, Robert G. Kuhs, Bernard C. Barmann, Jr.; Ellison, Schneider, Harris & Donlan, Christopher M. Sanders; Zimmer & Melton, Richard Zimmer; Law Office of LeBeau Thelen, Bob H. Joyce; Lesnick Prince & Pappas, Michael E. Pappas, Debra E. Cardarelli; Air Force Legal Operations Agency, Edwin Oyarzo; Jeffrey Bossert Clark, Assistant Attorney General, Eric Grant, Deputy Assistant Attorney General, and John L. Smeltzer for Cross-defendants and Respondents.

-ooOoo-

---

[†]Retired Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Our Supreme Court recognized over 40 years ago that "'[t]he scope and technical complexity of issues concerning water resource management are unequalled by virtually any other type of activity presented to the courts. What constitutes reasonable water use is dependent upon not only the entire circumstances presented but varies as the current situation changes … "[and the] inquiry cannot be resolved *in vacuo* from statewide considerations of transcendent importance."'" (*Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 194, quoting *Joslin v. Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 140.) The legal and technical complexities inherent in any water rights adjudication grows exponentially when a court is called upon to craft a comprehensive resolution that must accommodate the legally cognizable water rights claims of thousands of users who are all competing for access to an overburdened source of supply that is insufficient to meet all of the demands placed upon it. This is such a case.

Over 20 years ago, the first lawsuits were filed that ultimately evolved into this proceeding known as the Antelope Valley Groundwater Cases (AVGC). Numerous parties asserted that, without a comprehensive adjudication of all competing parties' rights to produce water from and a physical solution for the aquifer, the continuing overdraft[1] of the basin would negatively impact the health of the aquifer. After the

---

[1]In the context of an aquifer, "overdraft" occurs when the average annual withdrawals or diversions from the aquifer exceed the "safe yield" of a groundwater supply and would lead to ultimate depletion of the available supply. (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1272.) The safe yield is "'the maximum quantity of water which can be withdrawn annually from a ground water supply under a given set of conditions without causing an undesirable result.' The phrase 'undesirable result' is understood to refer to a gradual lowering of the ground water levels resulting eventually in depletion of the supply." (*City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 278, disapproved on other grounds in *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1248 (*Barstow*).) In essence, safe yield examines the available groundwater recharge from replenishing sources such as native precipitation and associated runoff, along with return flows from such sources, less losses incurred through natural groundwater depletions such as subsurface outflow or evaporative losses. (*City of Los Angeles*, *supra*, at pp. 278–279; see *Tehachapi-Cummings County Water Dist. v. Armstrong* (1975) 49 Cal.App.3d 992, 996, fn. 3 (*Tehachapi-Cummings*) ["Natural 'safe

Judicial Council ordered all then-pending lawsuits coordinated into this single adjudication proceeding, the trial court embarked on an 11-year process, employing phased proceedings, to adjudicate how to accommodate the rights and needs of competing users while protecting the threatened alluvial basin. The parties asserting competing usufructuary claims to pump water from the alluvial basin included numerous entities or agencies that pumped water to supply their thousands of customers (for largely domestic use) within the Antelope Valley Adjudication Area (AVAA), the federal government, and scores of owners of overlying lands who pumped water primarily to use for agricultural, industrial, commercial and domestic uses on their overlying properties.

The individual overlying landowners who extracted water for their farming or other operations within the AVAA included individual entities (such as Bolthouse Properties LLC and Diamond Farming Co.), medium and smaller landowners, and also included a group of 16 "mutual water companies" formed by owners of overlying lands who transferred their water rights to the company in exchange for stock in that company; those companies own, operate and maintain infrastructure to produce and deliver water from the aquifer solely to their shareholders.

Two other large groups participated in the litigation. The first group, known as the "Willis Class" (hereafter Willis), was formed by the court to represent the interests of a large group of persons who owned overlying land in the AVAA but who had not pumped water from the aquifer for any purposes. Another smaller class, known as the "Wood Class" (hereafter Wood) or the "Small Pumper Class," was formed by the court to represent the interests of another large group of overlying landowners who historically had pumped not more than 25 acre-feet per year (afy) from the aquifer during the relevant period.

yield' is the maximum quantity of ground water, not in excess of the long-term, average, natural replenishment (e.g., rainfall and runoff), which may be extracted annually without eventual depletion of the basin"].)

4.

Willis was named for the original class representative, Rebecca Lee Willis, who alleged she owned a 10-acre parcel with the intent to develop it in the future for a home and nursery, but which was not currently within a water district's service area, and therefore would need to use groundwater to develop her land. When Rebecca Lee Willis sold her land in 2012, the class sought and received permission to substitute David Estrada as class representative. He similarly asserted he owned land within the AVAA that he intended to develop for future uses but lacked water sources apart from groundwater. For ease of reference, we will use the original nomenclature appended to the class.

By 2009, the litigation had evolved into a complex array of dozens of separately filed actions and cross-actions, with thousands of Doe and Roe defendants. The litigation was eventually tried in six separate phases. The third phase of trial had bifurcated and scheduled for decision the issues of the basin-wide annual safe yield and whether the aquifer was in overdraft. Shortly before the "Phase 3" trial, the court consolidated all the then-pending actions. They all involved the primary core common issue—the competing claims to draw groundwater from the aquifer—which required an *inter se* adjudication of all claims by all parties to the available groundwater. The consolidation order specified that, while consolidation would not preclude individual parties from entering bilateral or multilateral settlements of their separate actions or claims against each other, any such settlement would be required to expressly retain the court's jurisdiction over them to enter a judgment resolving all claims to produce groundwater and to create a physical solution as necessary, and that any such bilateral or multilateral settlement would be merged into a comprehensive single judgment declaring the extent of production rights and creating a physical solution.

Prior to the Phase 3 trial, Willis settled their action against the agencies or entities named in their original complaint, as well as the other public water suppliers or agencies

who were not originally named as defendants in Willis's action.[2]  It is the import and impact of this settlement agreement (the Settlement) that forms the basis for many of Willis's claims in the present appeal.  The court ultimately approved the Settlement.

After the Settlement, the court heard and decided the remaining phases of the proceedings.  In Phase 3, the court determined the AVAA's basin-wide annual safe yield and found the basin was in a state of chronic overdraft because annual extractions exceeded that safe yield by a considerable margin.  In "Phase 4," the court quantified how much water was currently being pumped by each of the major competing water rights claimants, and this quantification confirmed that annual current extractions (even without considering the amounts extracted by the Small Pumper Class) were in excess of the safe yield for the AVAA basin.

The next phase, which contemplated trial of the issues of federal reserved water rights and imported water return flow rights, was interrupted by settlement discussions.  Those discussions ultimately produced an agreement among the vast majority of parties in which they settled their respective groundwater claims and agreed to support the contours of a proposed plan (the "Physical Solution") designed to bring the AVAA basin into hydrological balance.

Willis and a few others did not join in support of the proposed Physical Solution.  Accordingly, the court ultimately held a trial on the rationale for and efficacy of the proposed Physical Solution.  Willis raised numerous objections to the proposed Physical Solution, but the court found the proposed Physical Solution was reasonable, fair and

---

[2]The Willis class action complaint included claims against, among others, Los Angeles County Waterworks District No. 40 (District 40), Palmdale Water District, Littlerock Creek Irrigation District, Palm Ranch Irrigation District, Quartz Hill Water District, Antelope Valley Water Co., Rosamond Community Services District, California Water Service Company, and the City of Palmdale.  In the ultimate settlement with Willis, that group of entities was joined by Phelan Piñon Hills Community Services District, the Desert Lake Community Services District, and North Edwards Water District as the group of settling defendants.

beneficial as to all parties, served the public interest, and was consistent with the Settlement, and ultimately approved the Physical Solution.

On appeal, Willis argues the judgment approving the Physical Solution must be reversed because it violates California's water rights priorities structure and California's mandate that available water be reasonably and beneficially used. Willis alternatively asserts that, even if the Physical Solution does not transgress California's guiding water law principles, the approved Physical Solution violated the separate requirement of the Settlement that any final judgment be consistent with the Settlement. Third, Willis appears to assert that, even if the Physical Solution comported with both California law and with the Settlement, the court's failure to apportion to Willis some part of the basin's native safe yield (and the accompanying restrictions placed on Willis's future access to groundwater) was an abuse of the court's discretion. Finally, Willis asserts the constraints placed on their participation in the litigation, particularly during the final phase of the trial examining whether to approve the Physical Solution, deprived them of due process and mandates reversal.

We conclude the Physical Solution does not violate California water law principles and is consistent with the Settlement. Thus, the court did not abuse its discretion when it equitably apportioned the available groundwater and placed limits and conditions on future pumping. We also conclude Willis was not denied due process. Accordingly, we will affirm the judgment.

# I

# THE AVAA

## A.      Factual Setting

The AVAA encompasses a vast desert area of over a thousand square miles. As of 2005, it was home to over 450,000 people, with substantial projected population growth in the future. It is also home to Edwards Air Force Base, making the United States the AVAA's largest single landowner. Its regional economy, while historically rooted in

agricultural operations, has been shifting to include increased residential communities, as well as industrial and mining operations.

The principal source of water supporting all of these uses is the aquifer underlying the AVAA, along with some supplemental imported water from the State Water Project and some reclaimed water. The aquifer underlying the AVAA was in a state of overdraft, meaning that long-term extractions from the aquifer have exceeded the amount of water replenishing that aquifer by "significant margins." It had been in overdraft for decades before the current litigation commenced in 1999. While localized conditions led to variable impacts from this overdraft within specific subportions of the AVAA, the overall water levels within the AVAA basin were declining, and declining water levels have caused significant long-term damage, including subsidence and lost aquifer storage capacity. The estimated average annual safe yield from all sources of recharge (natural sources such as precipitation, external sources such as imported water, and return flows) was 110,000 afy for the AVAA basin, but the numerous parties who pumped water from that basin were annually extracting an estimated 130,000 to 150,000 afy.

## B. The Competing Water Use Claimants

### 1. The Public Water Suppliers (PWS)

The PWS are a group of agencies and special districts formed to supply water to their customers. District 40, the largest of these entities, is the largest urban water supplier for the region's cities and pumps from the aquifer to supply those customers. It supplies water to over 200,000 people within the AVAA. It has over 56,000 metered retail water service connections, of which approximately 94 percent are residential customer connections. Other public water entities occupying roles similar to District 40 included Palmdale Water District, Littlerock Creek Irrigation District, Palm Ranch Irrigation District, and Quartz Hill Water District. District 40 also purchases water from the State Water Project, which is imported into the AVAA and supplements the basin's native safe yield.

8.

## 2. *The Federal Government*

The United States owns approximately 300,000 acres overlying the AVAA basin. Its operations on those lands include Edwards Air Force Base. The United States claimed federal reserved water rights of up to 11,500 afy for military purposes distinct from any correlative rights it had as an overlying landowner.

## 3. *The Overlying Landowners Presently Using Groundwater*

There are multiple categories of owners of overlying land who, collectively, extract the majority of the basin's water.

There are numerous individual persons or entities who own overlying land and who extract water for use on that land. This group includes corporate landowners such as Bolthouse Properties LLC and U.S. Borax, which extracted an average of approximately 17,000 and 1,000 afy, respectively, during 2011 and 2012 to supply their farming and mining operations on their owned land, as well as individual landowners with wildly varying levels of water use on their land. For example, the Kyles and R & M Ranch averaged over 9,000 afy on their lands during the 2011 and 2012 measurement period. Two other owners, the Recas and the Sieberts, pumped an average of 500 and 200 afy, respectively, during that same period, while yet another owner, Gene Bahlman, averaged only 5 afy during that period.

There were also numerous "mutual water companies," which were formed when the owners of overlying land being developed decided to incorporate the mutual water company and transfer their water rights to the company in exchange for stock. These mutual water companies own, operate, and maintain the infrastructure to produce and deliver water solely to these shareholders, and the shareholders (as owners of the land with the mutual water companies service district) had the right to receive water deliveries that is appurtenant to their owned lands.

Another large category of overlying landowners currently pumping from the aquifer for use on their property were the members of Wood or the Small Pumper Class. The class represented the interests of private landowners who had pumped less than 25

afy on their property during any year from 1946 through 2015. The class, after opt outs, ultimately represented over 3,000 privately owned parcels that fell within the class definitions.

Finally, the overlying landowners currently pumping from the aquifer for use on their property included several public entities and agencies (the "Public Overliers"). These included county sanitation districts, the Antelope Valley–East Kern Water Agency, the City of Los Angeles and other municipalities, and various State of California agencies.

### 4. The Overlying Landowners Not Presently Using Groundwater (Willis)

Willis was formed to represent the interests of approximately 18,000 private individuals or entities (with certain exceptions) that owned overlying land in the AVAA but who had not commenced extracting water from the aquifer during the five years prior to January 18, 2006.

## II

## THE LITIGATION

### A. The Presettlement Litigation

### 1. The Litigation Commences

Between late 1999 and early 2000, the first lawsuits (which ultimately evolved into the AVGC) were filed by Diamond Farming Co. and Wm. Bolthouse Farms, Inc., concerning competing water rights in the aquifer. These actions, styled as quiet title actions against various public water suppliers, sought a determination of the various rights and priorities of overlying landowners and others claiming the right to extract water from the AVAA basin. In 2004, District 40 filed its action seeking (1) a comprehensive determination of the water rights of the thousands of persons, companies, public water suppliers, public agencies and the federal government, and (2) a physical solution to alleviate the alleged overdraft conditions in the AVAA and to protect the AVAA basin. Among other claims, District 40 sought declaratory relief that it had

10.

obtained prescriptive rights to water from the aquifer, and that the water rights held by all other defendants (except other public entities) were subordinate to the PWS's prescriptively acquired rights.

After the Judicial Council granted District 40's petition to coordinate all of the then-pending actions, the court requested that District 40 refile its action as a first amended cross-complaint in the now coordinated proceedings. Accordingly, in early 2007, District 40 (along with numerous other PWS joining District 40 as cross-complainants), filed a cross-complaint seeking, among other things, a determination against all overlying landowners within the AVAA that the PWS cross-complainants had obtained prescriptive rights to certain amounts of water from the aquifer, and that the water rights held by all other parties (except other public entities) were subordinate to those prescriptively acquired rights.

### 2. *Phase 1: Determining the Geographic Boundaries of the AVAA*

The trial court segmented the various issues raised by the actions and held trials on these issues in phased proceedings. In October 2006, the court conducted trial to establish the jurisdictional boundaries for the AVAA. Establishing the boundaries was essential to ascertaining which parties and entities with claims to the groundwater would be necessary parties in the litigation, as either overlying owners with usufructuary rights in or as appropriators producing water from the aquifer, so that a comprehensive adjudication of all claims could be made in later proceedings. After hearing expert testimony, the court established the "basic" jurisdictional boundaries for the AVAA as largely coextensive with the boundaries of the alluvial basin as defined by the California Department of Water Resources' Bulletin 118.

### 3. *The Class Action Complaints*

After the court determined the jurisdictional boundaries of the AVAA and the PWS filed their 2007 cross-complaint asserting they had prescriptively acquired rights to certain water from the AVAA, Willis filed their class action complaint. Willis's action,

11.

filed solely against various public agencies, contested the claims of District 40 and other municipal water purveyors to prescriptively acquired rights, asserting such paramount rights would threaten Willis's rights as overlying landowners. Willis sought a declaration that their rights to present and future overlying uses of the aquifer water were superior to the claims of District 40 and other municipal water purveyors (as well as a declaration as to the priority and amounts all parties in interest were entitled to pump from the aquifer), and pleaded claims for various other forms of relief.

In 2008, Wood filed its class action complaint against various public agencies, which similarly alleged that the claims of District 40 and other municipal water purveyors to prescriptively acquired rights conflicted with Wood's superior rights as overlying landowners. Wood sought a declaration that the class's rights to use of the aquifer's water were superior to the claims of District 40 and other municipal water purveyors, as well as claims for other relief similar to that sought by Willis.

### 4. Phase 2: Determining Hydraulic Connectivity Within AVAA Boundaries

In the second phase, the court heard evidence to assess the hydrologic nature of the aquifer within the geographical boundaries set for the AVAA. The court specifically evaluated whether there were any distinct subbasins within the AVAA basin that lacked any hydrologic connection such that they should be treated as separate, unconnected basins for purposes of adjudication. The court concluded there was sufficient hydraulic connectivity within the AVAA basin as a whole to obviate any claim that certain sections should be treated as separate basins.

### 5. The Consolidation Order

In 2009, the PWS moved to transfer and consolidate all pending actions and cross-actions. The PWS asserted that, while the various pending actions involved disparate party alignments and interparty claims arising from those alignments, all the actions sought resolution of the same core issue: the determination of water rights in a single aquifer where similar claims for declaratory relief, resolution of overlying and

12.

prescriptive rights, and imposition of a physical solution required that a single judgment be entered as to all of the actions. In their motion to consolidate, the moving parties provided a matrix of the then-pending actions and cross-actions (some of which were pending in Kern County and others had been filed in Los Angeles County), and listed the thousands of parties added as Does and Roes to the PWS cross-complaint. After extensive briefing, the court granted the motion and entered its order consolidating all but one of the pending actions and cross-actions. The exempted action, however, was kept as a coordinated action.

The consolidation order noted the pending complaints and cross-complaints subject to its consolidation order all sought, in one form or another, a claim for declaratory relief seeking to determine the right to draw water from the aquifer. Because this claim was central to the various actions, and all claimed water rights in the aquifer were correlative to all other competing claims to water from the aquifer, a determination of any individual party's water right cannot be decided "in the abstract but must also take into consideration all other water rights within [the] single aquifer," and therefore all pending actions shared common issues of law and fact on the relative rights to draw water from the aquifer. The court, rejecting the argument that a consolidation order would require some parties to litigate against parties they had not sued, noted the "only cause of action that would affect all parties to the consolidation are the declaratory relief causes of action which seek a declaration of water rights (by definition, correlative rights)," and "[i]f the basin is in overdraft (a fact still to be established) the Court in each declaratory relief proceeding would of necessity have to look at the totality of pumping by all parties, evaluate the rights of all parties who are producing water from the aquifer, determine whether injunctive relief was required, and determine what solution equity and statutory law required (including a potential physical solution)." The court also noted consolidation was appropriate because it would allow for an entry of a single judgment adjudicating all water rights, which would provide the comprehensive adjudication of

13.

rights in the aquifer necessary to jurisdiction over the federal government (the AVAA's largest landowner) under the "McCarran Amendment" (43 U.S.C. § 666).

The consolidation order acknowledged there was a potential that parties to one or more of the previously separate actions might desire to enter a bilateral settlement of their separately filed competing claims.[3] To accommodate this potentiality, the court's consolidation order provided:

> "This order of consolidation will not preclude any parties from settling any or all claims between or among them, as long as any such settlement expressly provides for the Court to retain jurisdiction over the settling parties for purposes of entering a judgment resolving all claims to the rights to withdraw groundwater from the Antelope Valley Groundwater Basin as well as the creation of a physical solution if such is required upon a proper finding by the Court. Upon appropriate motion and the opportunity for all parties in interest to be heard, the Court may enter a final judgment approving any settlements, including the *Willis* and *Wood* class settlements, that finally determine all cognizable claims for relief among the settling parties for purposes of incorporating and merging the settlements into a comprehensive single judgment containing such a declaration of water rights and a physical solution. Any such settlement can only affect the parties to the settlement and cannot have any [e]ffect on the rights and duties of any party who is not a party to any such settlement. Complete consolidation shall not preclude or impair any class' right to seek the entry of a final judgment after settlement."

### B. Settlement Between PWS and Willis

#### 1. *A Settlement Is Reached*

In July 2010, the PWS, along with Phelan Piñon Hills Community Services District, and Willis reached the comprehensive Settlement of their *inter se* disputes. In October 2010, Willis moved for preliminary approval of the Settlement, for approval of

---

[3]Indeed, Willis had raised concern that consolidation might jeopardize an "in principle" settlement they had reached with the PWS by preventing the court from approving it and entering a judgment thereon. Willis later objected a consolidation order might be counterproductive because the "in principle" proposed settlement, if conditioned by consolidation on final resolution of all other pending claims, would preclude entry of a final judgment on the proposed settlement and thereby hold it captive to the disputes between the PWS and other overlying landowners.

14.

the notice to the class of the pending Settlement, and to set a fairness hearing. The court granted the motion and scheduled the fairness hearing, and the approved class notice was provided to the class members.

The approved class notice stated, in part, that (1) the settling parties would not contest the PWS estimate of the native safe yield and total safe yields, but that (in the absence of agreement by all parties) the court would determine those amounts; (2) the settling parties agreed the settling PWS would have the right to produce up to 15 percent of a certain adjusted native safe yield and Willis would retain any correlative rights (along with other landowners) in the remainder; and (3) the parties agreed the AVAA required a groundwater management plan and agreed to be bound by a court-ordered plan. The notice explained the court would be required independently to determine the basin's safe yield (which would be binding on the class), and Willis would be required to comply with the terms of the physical solution adopted by the court and the court would not be bound by the settlement agreement in that regard. The notice advised the class that the Settlement did not provide for any monetary payments, but "simply preserves your correlative rights to use … groundwater," and while there were currently no restrictions on class members' ability to pump water, it is "likely that there will be limits imposed on the amount of pumping," and any later pumpers "will be required to install meters on their pumps."

### 2. *Terms of the Settlement*

The parties, after reciting the history of the proceedings, noted the PWS contended they had prescriptively acquired rights in the AVAA basin to substantially more than 15 percent of the native safe yield, while Willis asserted the PWS had no prescriptive rights as against Willis. The parties also noted the PWS asserted (and Willis agreed it would not contest) the AVAA had a native safe yield of 82,300 afy and a total safe yield of 110,500 afy, but the parties agreed to be bound by the court's determination of those amounts.

15.

The parties also agreed on "Allocation of Federally Adjusted Native Safe Yield." They first acknowledged the United States had a "federal reserved right" in the native safe yield and they would be bound by the court's determination of the amount of that reserved right, and the Settlement defined the federally adjusted native safe yield as the native safe yield less the prior year's production of water by the United States up to the federal reserved right. The parties agreed PWS and Willis had rights to produce water from this adjusted native safe yield, and agreed the fair allocation of the settling parties' respective rights permitted PWS the right to collectively produce up to 15 percent of this adjusted native safe yield and Willis had an "Overlying Right to a correlative share of 85% of [this] Federally Adjusted Native Safe Yield," and that their respective shares could be drawn without any replacement assessment. The parties defined "correlative rights" as the "principle of California law, articulated in *Katz v. Walkinshaw* (1903) 141 Cal. 116 and subsequent cases, that Overlying Owners may make reasonable and beneficial use of the water in a Basin and that, if the supply of water is insufficient for all reasonable and beneficial needs, each Overlying Owner is entitled to a fair and just proportion of the water available to the Overlying Owners." The parties agreed neither Willis nor the PWS would take any position or enter any agreement inconsistent with their agreements.

The parties also acknowledged that (1) if the court subsequently determined Willis did not have overlying rights, the Settlement would not require the PWS to give Willis any right to pump from the native safe yield, and (2) other overlying users may have the right to pump (correlatively with Willis ) from the remaining 85 percent of this adjusted native safe yield for reasonable and beneficial uses on their overlying land.

The agreement also acknowledged the parties had the right to recapture return flows from imported water and would be entitled to produce water from the aquifer in an amount equal to return flows from such imported water without any replacement assessment. The parties also recognized there would be a need for a groundwater

16.

management plan, overseen by an appointed watermaster, to ensure pumping did not exceed the total safe yield of the aquifer, and contemplated their Settlement would become part of the physical solution entered by the court to manage the AVAA basin. They agreed to be part of that physical solution "to the extent it is consistent with [the Settlement]," and that could include the requirement that individual class members install a meter on any pump as a condition to a class member producing water from the aquifer. They also recognized that a settling party could produce groundwater "above their share of the Native Safe Yield" but such right would be subject to the Physical Solution, and that any settling party who produced more than its share would be responsible for either providing replacement water or paying a replacement assessment to the watermaster so the watermaster could purchase imported water to recharge the aquifer.

### 3.     The Settlement Is Approved and Judgment Entered

In early 2011, Willis moved for an order granting final approval of the Settlement. Responding to objections to the Settlement from several parties,[4] Willis asserted the Settlement was "fair to all concerned—including the non-settling parties" because "[w]ith respect to the latter, the Stipulation expressly provides that it 'shall not … be construed to prejudice the rights, claims, or defenses (whether asserted or potential) of any persons who are not Settling Parties.' [Citation.]  Furthermore, the [Settlement] provide[s] that

---

[4]A large landowner, along with another group of overlying landowners, interposed objections to the terms of the Settlement.  They asserted the Settlement was objectionable insofar as it purported to expand and resolve the Willis claims beyond the pleaded claims (which were limited to Willis's contest of the PWS's prescription claims against nonpumping landowners) and might be construed as settling "the correlative rights of class members vis-à-vis other overlying landowners."  They objected that, while Willis and PWS could settle their contest over PWS's prescriptive rights vis-à-vis Willis, they could not incorporate provisions that "include and/or affect in any way the rights of other parties to litigation" and objected that the settlement would be improper "[t]o the extent [it] is intended to be imposed on the non-settling parties … as a physical solution …."  Willis, dismissing the objectors' arguments, asserted the objectors lacked standing to object because the Settlement was crafted expressly to provide that the interests or claims of nonsettling overlying owners vis-à-vis members of Willis were *not* prejudiced by the Settlement.

the Court retains jurisdiction over the Settling Parties for further proceedings, including the entry of a Physical Solution if appropriate."

In May 2011 the court entered judgment approving the Settlement.

### C.     Postsettlement Phases and Proceedings

#### 1.     *Phase 3: Determining Safe Yield and Overdraft*

The Phase 3 trial, conducted contemporaneously with proceedings on approval of the Settlement, litigated the safe yield for the AVAA basin and whether the area encompassed within the AVAA was in overdraft. The PWS, along with numerous other parties, contended the average annual extractions from the basin exceeded the relevant safe yields and that it was in overdraft. They proffered extensive testimony on average annual recharge, annual extractions, and the deleterious impacts caused by the chronic overdraft of the basin. Willis did not participate in the Phase 3 proceedings because of the pending Settlement, which recognized the court would determine the safe yield and such determination would bind Willis.

The court found the basin was in a state of overdraft and that average extractions had significantly exceeded average recharge for decades, causing a steady lowering of water levels and accompanying subsidence since 1951. The court concluded the average total safe yield from all sources was 110,000 afy for the AVAA as a whole, while current actual extractions from the AVAA as a whole (ranging between 130,000 and 150,000 afy) exceeded average annual recharge. Accordingly, the court found (1) the AVAA was in overdraft and (2) the safe yield was a total of 110,000 afy.

The *total* annual safe yield ultimately set by the court in this phase as the appropriate "quantity of pumping from the basin [which] will maintain equilibrium" in the aquifer appears to have amalgamated two different components: amounts attributable to "native" water and amounts attributable to "imported" water. Various experts testified that *native* water additions (i.e., water coming into the basin from precipitation and runoff) provided new water to the AVAA basin ranging between 55,000 to 68,000 afy.

18.

When return flows from that native new water were calculated, the PWS contended the *native* safe yield should be set at approximately 82,300 afy for the AVAA basin as a whole. However, various entities also imported water into the AVAA, and when that *imported* water (along with *its* return flows) was added to the native supply, the total safe yield for the AVAA basin was determined by the court to be 110,000 afy.

### 2. *Phase 4: Determining Actual Groundwater Production by Claimants*

In the next phase, the court ultimately determined it would limit trial to individualized determinations of how much water the various stakeholders actually pumped from the AVAA basin during the years 2011 and 2012. Initially, the case management order for the Phase 4 trial contemplated it would encompass issues in addition to current groundwater production for the two-year period that preceded the Phase 4 trial. However, the case management order ultimately provided the "Phase [4] Trial is only for the purpose of determining groundwater pumping during 2011 and 2012. The Phase [4] Trial shall not result in any determination of any water right, or the reasonableness of any party's water use or manner of applying water to the use. The Phase [4] Trial will not preclude any party from introducing in a later trial phase evidence to support its claimed water rights …. All parties reserve their rights to produce any evidence to support their claimed water rights and make any related legal arguments including, without limitation, argument based on any applicable constitutional, statutory, or decisional authority."

Based on the stipulations and evidence presented by numerous parties about the amounts pumped during the relevant time frames, the court determined the amounts actually pumped by the various major stakeholders during those sample years exceeded the previously determined safe yield for the AVAA basin. The court found that, during the sampled years, the parties cumulatively pumped in excess of 120,000 afy even before consideration of the amounts pumped by Wood, and apparently without consideration of the amount that would be subject to any federal reserved right.

19.

### 3. Phase 5: Federal Reserved Rights and Imported Water Return Flow Rights

The "Phase 5" trial bifurcated two issues (federal reserved water rights, and any claimed rights to recapture and use any return flows from water imported into the AVAA) for the next trial phase. However, during the evidentiary presentations, the parties requested a recess of pending proceedings to permit further settlement discussions. The parties then met and conducted settlement discussions, and in April 2014, the parties informed the court that the vast majority of the parties had reached a proposed global settlement of their respective groundwater claims. This global settlement included agreement on the contours of a basin-wide groundwater management plan to implement a physical solution to the AVAA basin's overdraft conditions, which included an allocation of the available native safe yield among the parties to the global settlement.

### 4. Trial of Unsettled Claims

Several parties did not join in the proposed global settlement and physical solution. Because some parties were unable to reach a satisfactory agreement to accommodate their claims to pump water from the AVAA basin, the court scheduled trials (1) to litigate and resolve those claims for relief, and (2) to consider whether to adopt the proposed Physical Solution. The claims of one of the objecting parties, Phelan Piñon Hills Community Services District, were heard and resolved in a series of proceedings and decisions both prior to and as part of the final hearings on the global settlement and proposed Physical Solution. (See *Antelope Valley Groundwater Cases* (2020) 59 Cal.App.5th 241, 254–258.)

### 5. Willis Class Opposition to the Global Settlement and Physical Solution

Prior to trial on the proposed Physical Solution, Willis signaled it would oppose any physical solution which proposed subordinating their overlying correlative rights in the native safe yield to those rights held by actively pumping overlying landowners.

20.

Willis filed pretrial motions, styled as motions "To Enforce Settlement Agreement" and to "Enforce Due Process Rights," which variously contended the proposed global settlement and physical solution were inconsistent with the Settlement because it de facto subordinated Willis's rights to other overlying users without any notice or opportunity to defend against such a claim for relief against them. The court denied the motions without prejudice.

Willis also sought a court order to appoint an expert for the class, at PWS's expense, to evaluate and opine on various aspects of the proposed global settlement and Physical Solution and its impacts on Willis. The PWS objected, arguing, in part, that the only matter at issue for Willis was whether the global settlement was consistent with the Settlement, which presented a question of law on which expert testimony was improper. The court denied Willis's motion. Willis also moved in limine to allow it to introduce competing "plans," which contained alternative allocations of the native safe yield to preserve segments of the native safe yield for future use by Willis. The court at trial, responding to a motion to limit Willis to challenging whether the proposed global settlement and Physical Solution was "inconsistent" with the Settlement, sustained objections to testimony from witnesses about alternative proposals.

### D. The Final Phase: Trial on the Proposed Physical Solution and Unresolved Claims

In the fall of 2015, the court held hearings on the proposed Physical Solution. The court also held trial on various unresolved claims, which included admitting extensive evidence supporting the PWS's claim for prescriptive rights as against certain parties (including the Tapia parties, the defaulted parties, and the nonappearing parties) who had not agreed to the Physical Solution. This evidence included testimony from a historian on the decades-long public notoriety of the overdraft conditions and their impacts on the area. The court ultimately found in favor of the PWS's prescriptive claims because the evidence showed their adverse use was continuous, open and notorious, and under claim of right.

21.

The court also heard evidence from numerous experts concerning the proposed Physical Solution. Dr. Dennis Williams, an expert with extensive experience with groundwater hydrology, opined the proposed Physical Solution would bring the AVAA basin back into balance because of its component parts: the requirement that existing users substantially reduce (or "rampdown") their water consumption during the rampdown period, the importation of supplemental water, and the management and monitoring provisions of the newly created watermaster for the AVAA. Charles Binder, a civil engineer who acted as a watermaster for another watershed, similarly testified the provisions of the judgment and proposed Physical Solution would bring the AVAA basin back into hydrologic balance.

Two other experts opined the parties who were presently using water, and who had allocations of portions of the native safe yield under the proposed Physical Solution, were reasonably using the water they extracted and devoting it to beneficial purposes. One expert, Robert Beeby, was an agricultural engineer with expertise in "crop duties." He explained "crop duties" is the amount of water applied to produce a particular crop under prevailing climate and other conditions (wind, temperature, soil conditions, etc.) and the requisite growing season. Some crops, such as alfalfa, have a higher crop duty (i.e., require more water per acre farmed) than other crops such as carrots or onions.

Beeby prepared a detailed spreadsheet for over 100 water users, listing their pre-rampdown average yearly pumping, the range of acres to which the water was applied, and identifying the claimed beneficial use for that water: irrigation, agriculture, municipal/industrial, domestic, reclamation, and wildlife habitat. Beeby derived the information from data collected during the Phase 4 trial and subsequently provided to him. For example, a declaration filed by the owner of Diamond Farming Co. and Crystal Organic Farms listed the amounts of water pumped, the total acres controlled by the owner, and the crops irrigated using that water (including carrots, onions and potatoes), and this data was integrated into Beeby's spreadsheet.

22.

For users with agricultural uses, Beeby's spreadsheets listed the specific agricultural products (specific crops, or livestock, or dairy, or other uses) for which the water users appeared to be using the water pumped by them. He opined that, with limited exceptions, the historical amounts pumped by the overlying landowner did not "jump out" as exceeding the reasonable crop duties or other applied duties for the type and extent of the listed uses. He also opined that, once water usage was "ramped down" to the final levels of overlying production rights assigned to these landowners under the Physical Solution, the overliers would have to alter their farming practices (either by reducing the acreage farmed or switching to crops with a lower crop duty) or import more water, because their ramped down usage levels would be insufficient to continue farming their entire acreage with crops they historically produced. For example, he testified the Kyles had nearly 1,000 acres they had historically devoted to producing alfalfa, but their post-rampdown allocation was only 3,670 afy (allowing them only 3.68 afy per acre of land), which was well below the amount necessary for alfalfa production on their entire acreage.

A second expert, Robert C. Wagner, was a water engineer with extensive experience in water resources management, including serving for 19 years as the watermaster engineer for the adjoining Mojave basin. He reviewed the materials documenting the amounts of water historically used by the various parties and types of uses to which they devoted that water. He also compared their historical use to the post-rampdown production rights under the proposed Physical Solution. Wagner used crop duties to assess agricultural uses, and also used analogous measures to assess the amounts consumed for industrial and other types of water uses by the various parties. He developed a list of the categories of beneficial uses recognized under applicable California regulatory law and compared that list to the common uses of water within the AVAA. Based on that comparison, Wagner opined the historical uses by the parties to the Physical Solution were recognized beneficial uses under applicable California law,

23.

and that the amount of water used for those beneficial purposes fell within the appropriate parameters.

The court also heard testimony and argument from Willis proffered in opposition to the proposed judgment and Physical Solution. Willis argued it (1) conflicted with the terms of the Settlement, (2) conflicted with California law, (3) imposed undue and unreasonable burdens on Willis, and (4) violated Willis's due process rights. Willis proffered expert testimony from Dr. Rodney Smith, explaining he would testify as to (1) the value of an allocated water right, (2) the effective rate of the native safe yield allocated to the PWS, (3) alleged inconsistencies between the Settlement and the proposed judgment and Physical Solution, (4) the costs of new well construction, and (5) three alternative models that would include allocations for Willis. The court sustained objections to his testimony.

Willis also offered expert testimony from Stephen Roach, who opined the impact of procedures and limits on new pumping under the proposed Physical Solution greatly diminished the value of Willis members' land. Willis also offered percipient witness testimony from two Willis members on the importance of water to their future land uses, as well as testimony from a prospective buyer of a parcel who opted not to purchase because of the difficulties and costs of obtaining new water production under the proposed Physical Solution.

### E.     The Final Judgment and Adoption of the Physical Solution

The court's final judgment, which incorporated determinations from prior phases, found the collective demands by those holding water rights in the AVAA basin exceeded the available safe yield for the basin, and that a comprehensive adjudication of all of the water rights within the AVAA basin and a water resource management plan was required to prevent further depletion of and damage to the AVAA basin. The court found the United States had produced substantial evidence establishing its federal reserved water right, and that the PWS had produced substantial evidence showing they had acquired a

24.

prescriptive right to pump approximately 32,000 afy as against those parties who had not joined in the stipulated judgment.

The court further found that various overlying landowners and Public Overliers who had joined in the global settlement had established (1) they possessed overlying rights to the basin's native safe yield by producing evidence of their ownership of overlying lands and the amounts of the basin groundwater they actually used, (2) that the water used were reasonable and beneficial uses of such water, and (3) that the total amounts so used exceeded the total native safe yield.

The court made similar findings as to a group of nonstipulating landowner parties who claimed overlying rights in the basin's groundwater by proof of their land ownership or other interest in the basin. While this group was not signatories to the original global settlement, they supported the proposed judgment and Physical Solution and agreed to reduce production under paragraph 5.1.10 of the Physical Solution to certain specified amounts. The court found these parties had shown they had an overlying right to basin water, that they had reasonably and beneficially used basin water, and that the amounts they were allocated under the Physical Solution represented a severe reduction of their historical and current uses and represented amounts they applied to reasonable and beneficial uses. The court also granted final approval to a settlement for the Small Pumper Class, which allocated certain production rights to members of that class.

The court found that, because the native safe yield was well below the amounts used for reasonable and beneficial purposes by those with overlying, prescriptive, or reserved rights, it was necessary to allocate and limit production in the native safe yield among these rights holders to protect the basin for existing and future users. The court concluded the evidence presented during Phases 4 and 6 supported the conclusion that the Physical Solution, which required rights holders to severely reduce the amount of water they used and created an overarching water management plan for the basin, fairly allocated the available water supplies and made the maximum reasonable and beneficial

25.

use of the native safe yield in a manner which would protect the AVAA basin for existing and future users while preserving the ability of existing rights holders to continue using the available native safe yield.

The Physical Solution allocated 7,600 afy of the native safe yield to the United States as its federal reserved water right, but the United States also waived any future right to a correlative share as an overlying landowner. The judgment provided that, to the extent the United States in fact used less than its 7,600 afy in any given year, that unused balance would be allocated to the nonoverlying production rights holders (in proportion to their production rights under the judgment) for the following year only. This year-by-year supplemental redistribution specifically states it "does not affect the United States' ability to fully Produce its Federal Reserved Water Right … in any subsequent Year," and the production of any unused federal reserved water right production "does not increase any Non-Overlying Production Right holder's decreed Non-Overlying Production Right amount or percentage."

The Physical Solution also allocated annual overlying production rights in the native safe yield among the competing overlying landholders who were currently extracting water. An aggregate amount of 3,806.4 afy was allocated for the Small Pumper Class. The remaining available native safe yield (totaling 58,322.23 afy) was allocated as production rights among the remaining overlying producers, including overlying private landowners, various mutual water companies, public overlying landowners, and various state agencies.

For existing overlying rights holders who currently produced water from the aquifer, the judgment listed their pre-rampdown production and the production right assigned to them (both in acre-feet per year and as a percentage of the "Production from the Adjusted Native Safe Yield"). For example, the largest single overlying rights producer, Bolthouse Properties LLC, had pre-rampdown production of 16,805.89 afy, and a final production right of 9,945 afy (or 14.069 percent of the adjusted native safe

26.

yield), while other overlying rights producers (such as U.S. Borax, Inc.) were allocated the same amounts as both their pre-rampdown and final production rights.

Under the Physical Solution, the existing producers were subject to the rampdown provisions, which created a seven-year period in which these producers were required to reduce their water extractions from their pre-rampdown production to their assigned production right. During the first two years, these producers could extract up to their pre-rampdown production without paying any replacement assessment, and thereafter were required to reduce their production (in equal increments) over the next five years to reduce usage to their assigned production right, and any water extractions above those limits would be subject to a replacement assessment. Under the Physical Solution, while some producers (such as Bolthouse Properties LLC) were required to reduce their production by over 40 percent (with some producers required to reduce production by more than half, other producers (such as U.S. Borax, Inc.) were not required to reduce production from their pre-rampdown levels.

The Physical Solution finally allocated the remaining balance of the native safe yield (12,345 afy) to 11 public water suppliers as "Non-Overlying Production Rights." This 12,345 afy represented approximately 15 percent of the native safe yield.

The Physical Solution did not allocate any specific amount of the native safe yield to Willis. Instead, it specified any future pumping beyond the allocations specified in the Physical Solution would be governed by the terms of the Physical Solution. Under those terms, any "new production" from the aquifer (including by members of Willis) must comply with the new production application procedures. The Physical Solution provides that new production would be subject to payment of a replacement assessment. However, when such proposed new production was limited to domestic use for one single-family household, "the Watermaster Engineer has the authority to determine the New Production to be *de minimis* and waive payment of a Replacement Water Assessment."

The court made numerous findings on the provisions of the Physical Solution as it impacted Willis. The court first concluded that, under California law, a court may under certain circumstances limit or condition the future exercise of previously unexercised overlying water rights, and that the unique circumstances of the AVAA warranted the restrictions imposed by the Physical Solution on Willis's unexercised overlying rights. Specifically, the court noted the evidence showed the extractions by existing overlying rights holders for reasonable and beneficial uses had already exceeded the available native safe yield, even without consideration of the pumping by the PWS, which gave rise to the PWS's prescriptively acquired rights. Accordingly, the court found these unexercised overlying rights must be subjected to some limitations because, if Willis were granted an unlimited ability to exercise their overlying rights, the correlative rights of existing users with long-established overlying production would be rendered meaningless since the unexercised overlying rights could eliminate all water available for long-established users. The court found the AVAA required certainty through quantifying all pumping rights, including overlying rights, but Willis's overlying rights cannot be quantified, and allocating water for unexercised overlying rights would create an unacceptable measure of uncertainty and risk of harm to the public, and would unreasonably inhibit the long-range planning and investment critical to solving the overdraft conditions in the basin.

The court, after hearing evidence on all parties' water rights and considering those water rights in relation to California's reasonable use doctrine, found that "the unique aspects of this Basin explained below and its chronic overdraft conditions prevent [Willis] from having unrestricted overlying rights to pump Basin groundwater." The court ultimately found:

> "[T]he Court must impose a physical solution that limits groundwater pumping to the safe yield, protects the Basin long-term, and is fair and equitable to all parties. The Court's Physical Solution meets these requirements. It severely reduces groundwater pumping, provides management structure that will protect the Basin, balances the long-term

28.

groundwater supply and demand, and limits future pumping by management rules that are fair, equitable, necessary and equally applied to all overlying landowners. [¶] The Court also notes that [Willis] does not presently pump any groundwater and thus, has no present reasonable and beneficial use of water. The Court finds it would be unreasonable to require present users to further reduce their already severely reduced water use to reserve a supply of water for non-users' speculative future use. Here, quantification of overlying rights is necessary because there is a present need to allocate the native supply. Accordingly, the Landowner Parties, Public Overliers and Small Pumper Class are entitled to continue their significantly reduced production of the native or natural safe yield as set forth in the Physical Solution. [Citation.] [¶] The Court finds that without reasonable conditions upon the exercise of an overlying right in this overdrafted Basin, [Willis's] members' unrestricted right to exercise of the overlying right during shortage conditions would make it impossible to manage and resolve the overdraft conditions under the unique facts of this Basin and '[t]he law never requires impossibilities.' (Civ. Code, § 3531.) The Court therefore finds that [Willis's] members have an overlying right that is to be exercised in accordance with the Physical Solution herein."

The court also evaluated Willis's challenge to the judgment and Physical Solution based on the assertion it was inconsistent with their Settlement with the PWS. The court noted the settling parties understood (1) their bilateral agreement neither could nor did establish a water rights determination binding upon all other parties to the proceedings, (2) that water rights must be determined by the court as part of a comprehensive physical solution to the basin's chronic overdraft condition, and (3) Willis recognized their correlative rights would depend upon the correlative rights of all other overlying landowners in the basin.[5] The court concluded the Settlement recognized "that [Willis's] members may receive whatever is later to be determined by the Court as their reasonable correlative right to the Basin's native safe yield for actual reasonable and beneficial uses,

---

[5]The Settlement provided that "[Willis's] members recognize that other Overlying Owners may have the right to pump correlatively with them 85% of the Federally Adjusted Native Safe Yield of the Basin for reasonable and beneficial uses on their overlying land" (Settlement, section IV.D.3), and defined "correlative rights" as the "principle of California law … that Overlying Owners may make reasonable and beneficial use of the water in a Basin and that, if the supply of water is insufficient for all reasonable and beneficial needs, each Overlying Owner is entitled to a fair and just proportion of the water available to the Overlying Owners." (Settlement, section III.D.)

29.

[but] it could do nothing more. Nothing in the Decision, Judgment, or Physical Solution alters the agreed-upon allocations between the [PWS] and [Willis]. That relationship has no impact on the Court's duty to impose a Physical Solution that protects the Basin."

The court found the Physical Solution *was* consistent with the Settlement because (1) the Settlement recognized there would be court-imposed limits on Willis's correlative share because of the basin's chronic overdraft conditions, (2) no Willis member showed any present production rights for existing reasonable and beneficial uses, (3) the Physical Solution recognized Willis's correlative overlying rights, and (4) the burdens placed on Willis's future exercise of that right was not unreasonable in light of the burdens placed on other correlative rights holders (to significantly reduce their current pumping and to incur expenses) in a basin in which reasonable and beneficial water uses more than exceeded the native safe yield.

The court specifically concluded the limitations on Willis were not unreasonable because, as correlative rights holders in an overdrafted basin, they were only entitled to a fair and just proportion of the water available to all overlying landowners holding correlative rights. Because Willis had never produced groundwater, the Physical Solution recognized this fact and did not provide for a current allocation to Willis while preserving their ability to pump groundwater in the future, subject to reasonable conditions and limitations. The court found this balancing of the respective correlative rights was fair and just in light of the unique milieu of the AVAA, its long-standing overdraft conditions, the threat to the aquifer's stability from permitting overlying landowners to pump without conditions or limitations, and the significant restrictions applied to other correlative rights holders who had relied on (and continued to rely on) the basin for a sustainable groundwater supply.

The court also noted Willis members were accorded the same rights as similarly situated individuals to either prove a claim of right to the court (under § 5.1.10 of the Physical Solution) or, like all other pumpers in the basin, apply to the watermaster for

30.

new groundwater production. The court noted that, to the extent a replacement water assessment *is* imposed on new production by Willis members, such an assessment would be reasonable (as well as consistent with the Settlement provision that Willis agreed to pay a replacement assessment if a member produced "more than its annual share" of the native safe yield) and such assessment was imposed uniformly on *all* overlying producers in the basin who produced more than their available allocation in any given year. The court also determined the costs associated with such an assessment were reasonable, noting that even if a replacement assessment *was* imposed, the replacement assessments for one acre-foot per year (an amount sufficient for domestic use) would result in an average cost for a Willis member of $26 per month (less than what most Californians are likely paying for that amount), and therefore did not unreasonably burden Willis members. Moreover, noted the court, a Willis member could avoid even that de minimus burden under the Physical Solution if the watermaster engineer determined the particular Willis member's proposed pumping was for domestic use and would not harm the basin or other groundwater users.

The court issued its judgment, adopted the Physical Solution, and issued a statement of decision explaining the basis for its judgment and Physical Solution. Willis timely appealed.

### III

### SUMMARY OF CONTENTIONS ON APPEAL

Willis appears to raise four overarching claims (with each such claim containing numerous subarguments) challenging the validity of the judgment and thereby requiring its reversal. First, they assert the court's Physical Solution is fatally incompatible with California law governing water rights and priorities in a groundwater basin. Second, they contend the Settlement required the Physical Solution ultimately adopted by the court to be consistent with the Settlement, and Willis argues the Physical Solution adopted by the court was inconsistent with the Settlement. Third, Willis appears to argue the conditions

31.

and limitations placed on Willis's future access to water was an abuse of the trial court's discretion because the articulated reasons for imposing such conditions and limitations cannot withstand scrutiny. Finally, Willis asserts the post-Settlement proceedings violated their due process rights.

We will conclude the judgment and Physical Solution adequately balanced the competing interests of the parties within the parameters of governing California law and was not inconsistent with the terms of the Settlement, and that the court's adoption of the limits and conditions imposed by the Physical Solution was not an abuse of discretion. We also reject Willis's claims that the limits placed on Willis's post-Settlement participation in the litigation amounted to a denial of due process. Accordingly, we will affirm the judgment.

**IV**

**OVERVIEW OF APPLICABLE CALIFORNIA LAW**

**A.    Sources of Water Rights**

California has been described as having a "dual system of water rights"[6] that recognizes two principal sources by which water rights in surface waters can be acquired: by riparian rights holders who have first priority to the available water for riparian uses, or by appropriation of water for nonriparian uses when there is water in surplus beyond that used by first priority users. (See generally *Santa Barbara Channelkeeper v. City of San Buenaventura* (2018) 19 Cal.App.5th 1176, 1183.)

> "Similar principles govern rights to water in an underground basin. First priority goes to the landowner whose property overlies the groundwater. These 'overlying rights' are analogous to riparian rights in that they are

---

[6]Although courts generally refer to the "dual system" of water rights, the courts have acknowledged that "California's water rights system is not really dual but is instead tripartite, because some pueblo rights superior to riparian or appropriative rights exist." (*Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 423, fn. 3.) Because pueblo rights are not implicated here, we will limit our evaluation to the principles used for resolving competing rights to groundwater that are grounded in rights held by overliers and rights acquired by prescription.

based on ownership of adjoining land, and they confer priority. [Citation.] Surplus groundwater also may be taken by an appropriator, and priority among 'appropriative rights' holders generally follows the familiar principle that '"the one first in time is the first in right."' ([*Barstow, supra*, 23 Cal.4th] at p. 1241.) With groundwater there is an exception, however, that gives rise to a third category of rights. Under certain circumstances, an appropriator may gain 'prescriptive rights' by using groundwater to which it is not legally entitled in a manner that is '"actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right."' (*Ibid.*)" (*Santa Barbara Channelkeeper v. City of San Buenaventura*, *supra*, at p. 1184.)

While water rights in an underground basin are typically categorized as overlying, appropriative, or prescriptive, an additional priority claim to such water, known as federal reserved water rights, can arise when the federal government had reserved land from the public domain and dedicates it for a specified purpose, like a military base. (Cf. *Cappaert v. United States* (1976) 426 U.S. 128, 138.)

The priority pumping right among overliers is a correlative interest: it is shared along with all of the other overlying landowners above the aquifer. (*Barstow*, *supra*, 23 Cal.4th at p. 1241.) Because it is a shared right, the interest of any specific individual overlier is delimited by the usufructuary interests of each other correlative right holder: "'as between the owners of land overlying strata of percolating waters, the rights of each to the water are limited, in correlation with those of others, to his "reasonable use" thereof when the water is insufficient to meet the needs of all.'" (*Central and West Basin Water Replenishment Dist. v. Southern Cal. Water Co.* (2003) 109 Cal.App.4th 891, 906.) While overliers are entitled to extract groundwater from the aquifer for the reasonable and beneficial use of their property (see *Katz v. Walkinshaw*, *supra*, 141 Cal. at p. 136), when the native supply "is insufficient, each is limited to his *proportionate fair share* of the total amount available based upon his reasonable need." (*Tehachapi-Cummings*, *supra*, 49 Cal.App.3d at p. 1001, italics added.) This correlative overlying right, which is appurtenant to ownership of the overlying land, is superior to claims of other persons whose claim lacks equivalent legal priority. (*Barstow*, *supra*, at p. 1240.)

33.

California recognizes a second type of usufructuary interest in water, described as "appropriative rights," which is the right to take and use surplus water for uses outside the overlying land. An appropriative right, which "'depends upon the actual taking of water'" (*Barstow*, *supra*, 23 Cal.4th at p. 1241), applies only when there are surplus waters available by permitting a party to take "'[a]ny water not needed for the reasonable beneficial use of those having prior rights [to] be appropriated on privately owned land for non-overlying use, such as devotion to public use ….'" (*Ibid*.) "'Proper overlying use, however, is paramount and the rights of an appropriator, being limited to the amount of the surplus [citation], must yield to that of the overlying owner in the event of a shortage, *unless the appropriator has gained prescriptive rights* through the [adverse, open and hostile] taking of nonsurplus waters.'" (*Ibid.*, italics added.)

As *Barstow* cautions, California recognizes another type of priority claim to available groundwater supplies: prescriptively acquired rights. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 278 (*Santa Maria*).) Although an appropriator is entitled to take any surplus groundwater that the overlying landowners do not need, the appropriator is limited to taking *only* the remainder (or surplus) of the basin's "safe yield." (*Id*. at p. 279, citing *City of Los Angeles v. City of San Fernando*, *supra*, 14 Cal.3d at p. 214.) As the *Santa Maria* court explained,

> "When total extractions exceed the safe yield the basin is said to be in overdraft. [Citation.] [¶] … Prescriptive rights arise when an appropriator continues to pump water during times of overdraft. 'An appropriative taking of water which is not surplus is wrongful and may ripen into a prescriptive right where the use is actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right.' ([*California Water Service Co. v. Edward Sidebotham & Son* (1964) 224 Cal.App.2d 715, 726.])" (*Santa Maria*, *supra*, at p. 279.)

When a nonoverlier's use of groundwater has ripened into a prescriptively acquired interest, the "[a]cquisition of [that] prescriptive right in groundwater rearranges water rights priorities among water users, elevating the right of the one acquiring it above that

34.

of an appropriator to a right equivalent in priority to that of a landowner." (*Id.* at p. 297, citing *San Fernando*, *supra*, at p. 293.)

## B. The "Reasonable and Beneficial Use" Overlay

An overlay to this California system for defining water rights is a key limiting principle: the rule of reasonableness. (*Santa Barbara Channelkeeper v. City of San Buenaventura*, *supra*, 19 Cal.App.5th at p. 1184.) A fundamental precept of California water law, embodied in article X, section 2 of the California Constitution, is "that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare." This overarching consideration applies to all water users, regardless of the source from which their rights are grounded (*Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 383), because no party has a protectable interest in the unreasonable use of water. (*Barstow*, *supra*, 23 Cal.4th at pp. 1241–1242.)

The rule of reasonableness means that paramount rights holders, while entitled to priority for water devoted to their reasonable and beneficial uses, may not be so profligate with their uses of available water that they deprive others of water that would otherwise be "surplus" and hence available for appropriation. As articulated by *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 925–926 (*Pasadena*):

> "[I]t is now clear that an overlying owner or any other person having a legal right to surface or ground water may take only such amount as he reasonably needs for beneficial purposes. [Citation.] Public interest requires that there be the greatest number of beneficial uses which the supply can yield, and water may be appropriated for beneficial uses subject to the rights of those who have a lawful priority. [Citation.] Any water not needed for the reasonable beneficial uses of those having prior rights is excess or surplus water … [which] water may rightfully be appropriated on privately owned land for nonoverlying uses, such as devotion to a public use or exportation beyond the basin or watershed."

## C.    Principles for Court Adjudications of Water Rights Disputes

Where a dispute arises between parties who interpose competing claims to extract water from an overdrafted underground basin, the parties may submit their dispute to a court to adjudicate and impose a physical solution that equitably allocates the available water in accordance with California's laws governing water rights.  (*Barstow*, *supra*, 23 Cal.4th at p. 1233.)  "The phrase 'physical solution' is used in water rights cases to describe an agreed-upon or judicially imposed resolution of conflicting claims in a manner that advances the constitutional rule of reasonable and beneficial use of the state's water supply."  (*Santa Maria*, *supra*, 211 Cal.App.4th at p. 287.)  Physical solutions are employed "to alleviate overdrafts and the consequential depletion of water resources in a particular area" (*California American Water v. City of Seaside* (2010) 183 Cal.App.4th 471, 480), and require the court to apply "general equitable principles to achieve practical allocation of water to competing interests so that a reasonable accommodation of demands upon a water source can be achieved."  (*Imperial Irrigation Dist. v. State Wat. Resources Control Bd.* (1990) 225 Cal.App.3d 548, 572.)

Although "a trial court may impose a physical solution to achieve a practical allocation of water to competing interests, the solution's general purpose cannot simply ignore the priority rights of the parties asserting them. [Citation.]  In ordering a physical solution, therefore, a court may neither change priorities among the water rights holders nor eliminate vested rights in applying the solution without first considering them in relation to the reasonable use doctrine."  (*Barstow*, *supra*, 23 Cal.4th at p. 1250.)  Thus, a court may employ equitable apportionment principles to allocate the available supply among competing claimants with equivalent priorities, as long as that physical solution does not "wholly disregard[] the priorities of existing water rights in favor of equitable apportionment … [and] adequately consider[s] and reflect[s] the priority of water rights in the basin" (*id*. at pp. 1247–1248) and does not "violate the constitutional principle that requires water to be put to beneficial use to the fullest extent possible."  (*Id*. at p. 250.)

Ultimately, "[e]ach case must turn on its own facts, and the power of the court extends to working out a fair and just solution, if one can be worked out, of those facts." (*Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 560–561.)

## V

## STANDARDS OF REVIEW

When a trial court exercises its equitable powers to adopt a physical solution, our review of that judgment is constrained by the deferential abuse of discretion standard of review. (*Barstow*, *supra*, 23 Cal.4th at p. 1256.) We must begin with the "most fundamental rule of appellate review … that a judgment is presumed correct, [and] all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance." (*Santa Maria*, *supra*, 211 Cal.App.4th at p. 286 [standard of appellate review for trial court judgment adopting a physical solution following trial court's groundwater rights determination].) When "[a] trial court exercises its equitable powers in approving a physical solution and entering the judgment, … review of that judgment is under the abuse of discretion standard of review." (*Hillside Memorial Park & Mortuary v. Golden State Water Co.* (2011) 205 Cal.App.4th 534, 549; accord, *Barstow*, *supra*, 23 Cal.4th at p. 1256 [when trial court "exercise[s] equitable powers in approving the proposed physical solution …, [court] properly review[s] the judgment under the abuse of discretion standard of review"].)

The oft-stated test for abuse of discretion is "whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.) The court's discretion as to equitable remedies, while not unlimited, should be granted deference when the record reflects the trial court has considered "the material facts affecting the equities between the parties." (*Dickson*, *Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 447; accord, *Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1222–

1223 (conc. opn. of Rushing, P.J.) ["At bottom the concept of 'discretion' is one of *latitude.* It means that on certain types of issues, the trial court's ruling will survive review even if the members of the reviewing court might have ruled otherwise.… [¶] … [¶] … Obvious examples may be found in the area of equitable remedies, where such questions as the balance of harms may be dependent on such a complex and debatable set of competing considerations that there is no social utility in second-guessing a decision, once it is properly made"].) "'The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

However, we apply a different standard of review insofar as Willis's appellate claims turn upon the proper interpretation of the Settlement. Those involve issues of law which we review de novo.[7] (See, e.g., *Crosby v. HLC Properties*, *Ltd.* (2014) 223 Cal.App.4th 597, 602–604.)

# VI

## THE JUDGMENT ACCORDS WITH CALIFORNIA LAW

Willis raises a host of arguments contending the Physical Solution violates California's law on water rights and hence requires reversal. We address those claims seriatim.

---

[7]Willis appears to suggest that, because de novo review can apply to a stipulated judgment (citing *In re Marriage of Smith* (2007) 148 Cal.App.4th 1115, 1120), we should apply de novo review to the judgment and Physical Solution as a whole because it was based, in part, on stipulations amongst various parties. We reject that argument because the 2015 judgment, while certainly based on a "stipulation and physical solution presented as the [Proposed] Judgment and Physical Solution," was entered after contested proceedings were held—at which evidence was introduced and challenges were considered—and the court made extensive factual findings upon which it concluded that it would "adopt[] [the proposed Physical Solution] as the Court's own physical solution." Accordingly, we will apply the ordinary abuse of discretion standard to our review of the judgment entered as the trial court's "own physical solution."

## A. The Physical Solution's Allocation of the Native Safe Yield Does Not Violate California's Water Priorities

Willis contends the Physical Solution violates California's prioritization of water rights in a groundwater basin because it allocated all of the available native safe yield[8] to (1) the PWS users holding a *lower* priority than Willis and (2) to other overliers with whom Willis shared *correlative* rights.

Willis correctly notes overlying landowners have rights to a basin's groundwater that are appurtenant to the land and are "superior to that of other persons who lack legal priority" (*Barstow*, *supra*, 23 Cal.4th at p. 1240), and that such overlying rights have priority over appropriators when there is no surplus available for an appropriator to draw upon. (See generally *Corona Foothill Lemon Co. v. Lillibridge* (1937) 8 Cal.2d 522, 530–531.) However, allocating part of the native safe yield to the PWS does not violate this precept of California's structure for prioritizing water rights: to the extent the PWS's uses of the groundwater had ripened into a *prescriptive* interest in the available groundwater, the PWS rights were transformed into rights entitled to equivalent priority with rights of overliers. (*Santa Maria*, *supra*, 211 Cal.App.4th at p. 297 [acquisition of a prescriptive right in groundwater "rearranges water rights priorities among water users, elevating the right of the one acquiring it above that of an appropriator to a right equivalent in priority to that of a landowner"].)

Many of Willis's arguments turn on Willis's contention that because the supply of water as part of a municipal water system is not an overlying groundwater right even where the lands supplied with water overlie the groundwater basin (citing *Pasadena*, *supra*, 33 Cal.2d at p. 927), the PWS hold only appropriative groundwater rights. However, to the extent of the PWS's perfected prescriptive rights, those rights have equal priority with overlying rights. The court heard extensive evidence and, based thereon,

---

[8]The native safe yield was 82,300 afy for the AVAA basin as a whole, but after deducting the United States' allotted federal reserved rights, the remaining available native safe yield was 74,700 afy.

determined the PWS *had* obtained prescriptive rights (which the trial court quantified as a prescriptive right to approximately 32,000 afy), and Willis makes no claim the evidence was insufficient to support that determination.[9]

Moreover, in settling the PWS's claims against Willis—claims which focused on acquiring prescriptive rights as against them—there was consent by Willis to allocate 15 percent of available native safe yield to the PWS in the overdrafted basin. Willis's Settlement, coupled with the trial court's finding on prescription, transformed the rights of the PWS from a mere appropriator into a right "equivalent in priority to that of a landowner." (*Santa Maria*, *supra*, 211 Cal.App.4th at p. 297.) Accordingly, we conclude the Physical Solution's allocation of part of the native safe yield to the PWS does not transgress, but is instead consonant with, California's water rights priorities. (See, e.g., *City of Los Angeles v. City of San Fernando*, *supra*, 14 Cal.3d at p. 293 [where prescription established, party has "a prescriptive right against the water rights concurrently held by a private defendant [and] [t]he effect of the prescriptive right would be to give to the party acquiring it and take away from the private defendant against whom it was acquired either (1) enough water to make the ratio of the prescriptive right to the remaining rights of the private defendant as favorable to the former in time of subsequent shortage as it was throughout the prescriptive period [citation] or (2) the amount of the prescriptive taking, whichever is less"]; *Santa Maria*, *supra*, at p. 297.)

Willis suggests the Settlement was limited to an agreement they would not contest allocating 15 percent to the PWS of a certain amount of the native safe yield, and that the Physical Solution allocated more than the agreed-upon amount. While we will evaluate this argument below when assessing Willis's claim that the *amount* allocated under the Physical Solution was not "consistent" with their Settlement, Willis's agreement that the

---

[9]Although the finding of this prescriptively acquired right was entered only against certain parties (i.e., the Tapia parties, defaulted parties, and parties who did not appear at trial), no such finding was *required* as to any other party because all other parties, including Willis, *consented* to allocating a share of the native safe yield to the PWS.

PWS were entitled to *some* share of the native safe yield is consonant with California's recognition that an acquired prescriptive right "elevat[es] the right of the one acquiring it above that of an appropriator to a right equivalent in priority to that of a landowner." (*Santa Maria*, *supra*, 211 Cal.App.4th at p. 297.)

Willis also appears to contend that our assessment of whether the allocation of water to the PWS comports with California law, at least independent from what Willis agreed to in the Settlement, cannot be premised on whether the PWS acquired *any* prescriptive interest as against Willis. Citing Hutchins, The California Law of Water Rights (1956) at page 309 to support this contention, Willis argues an appropriator cannot acquire *any* prescriptive interest as against a nonpumping landowner. Since Willis members were nonusers without need for the water, any pumping by the PWS cannot be deemed "adverse and hostile" because such use by the PWS did not deprive them of water required for their own purposes. However, the cases cited by the Hutchins treatise for such proposition did not address the use of groundwater from an overdrafted aquifer, it does not evaluate claims by an appropriator based on use of nonsurplus water, and it did not evaluate the impacts of case law (such as *City of Los Angeles v. City of San Fernando, supra*, 14 Cal.3d 199 or *Santa Maria, supra,* 211 Cal.App.4th 266), which postdate that treatise.

Willis alternatively argues the Physical Solution violates California law regarding prioritization of water rights because it allocates the remaining native safe yield to overlying owners who are currently pumping. Willis argues this allocation violates correlative rights principles, contending these principles confer on Willis the right to be treated *equally* with all of their fellow correlative rights holders when allocating access to the available native safe yield. However, the case law appears only to require that, as among correlative rights holders, proper division of an inadequate supply is tested by

41.

whether such division is *equitable*.**10**  (*Barstow*, *supra*, 23 Cal.4th at p. 1249 [a trial court "within limits … may use its equitable powers to implement a physical solution"]; cf. *Tehachapi-Cummings*, *supra*, 49 Cal.App.3d at p. 1001 [correlative rights "means that each has a common right to take all that he can beneficially use on his land if the quantity is sufficient; if the quantity is insufficient, each is limited to his *proportionate fair share* of the total amount available based upon his reasonable need" (italics added)].)

Thus, when crafting a physical solution for an overdrafted groundwater basin where a court must allocate a water supply that is insufficient to meet the reasonable needs of all who hold correlative rights, a court *may* employ equitable apportionment principles to allocate the available supply among competing claimants with equivalent priorities.  It may do so as long as the physical solution does not "wholly disregard[] the priorities of existing water rights in favor of equitable apportionment … [and] adequately consider[s] and reflect[s] the priority of water rights in the basin."  (*Barstow*, *supra*, 23 Cal.4th at pp. 1247–1248; accord, *Pasadena*, *supra*, 33 Cal.2d at p. 926 [overlying rights are held in common and each overlier "may use only his *reasonable share* when water is insufficient to meet the needs of all" (italics added)].)

We conclude that, when apportioning water in an overdrafted basin among correlative rights holders, a court should employ equitable apportionment principles and eschew mechanically based calculations to the extent necessary to reach an equitable apportionment of the available water.  (Cf. *City of Los Angeles v. City of San Fernando*, *supra*, 14 Cal.3d at p. 265 [allocating water based on prescriptive rights "does not necessarily result in the most equitable apportionment of water according to need.  A true

---

**10**The Settlement acknowledged and incorporated this guiding principle; while it did not allocate a specific portion (by quantity or percentage) of the remaining native safe yield to Willis, it recognized the court would determine the quantity of native safe yield that *was* available to distribute among correlative rights holders and further recognized that, when "the supply of water is insufficient for all reasonable and beneficial needs, each Overlying Owner is entitled to a *fair and just* proportion of the water available to Overlying Owners."  (Italics added.)

42.

equitable apportionment would take into account many more factors"].)  Equitable apportionment should factor in the various legal priorities accorded to the competing users.  But,

> "'if an allocation … is to be just and equitable, strict adherence to the priority rule may not be possible.  For example, the economy of a region may have been established on the basis of junior appropriations.  So far as possible those established uses should be protected[,] though strict application of the priority rule might jeopardize them.  Apportionment calls for the exercise of an informed judgment on a consideration of many factors.  Priority of appropriation is the guiding principle.  But physical and climatic conditions, the consumptive use of water in the several sections of the river, the character and rate of return flows, the extent of established uses, the availability of storage water, the practical effect of wasteful uses on downstream areas, the damage to upstream areas as compared to the benefits to downstream areas if a limitation is imposed on the former— these are all relevant factors.  They are merely an illustrative, not an exhaustive catalogue.  They indicate the nature of the problem of apportionment and the delicate adjustment of interests which must be made.'"  (*Id*. at pp. 265–266, fn. 61, quoting *Nebraska v. Wyoming* (1945) 325 U.S. 589, 618.)

The *Barstow* court, although concluding a physical solution based on equitable apportionment must adequately *account* for the water rights priorities of those impacted by the apportionment, nevertheless agreed that "within limits, a trial court may use its equitable powers to implement a physical solution" (*Barstow*, *supra*, 23 Cal.4th at p. 1249), and "may impose a physical solution to achieve a practical allocation of water to competing interests."  (*Id.* at p. 1250.)  Indeed, *Barstow* appears to uphold (at least by negative implication) the use of equitable apportionment principles when considering how to apportion water *among* correlative rights holders.  (See, *id.* at p. 1248 ["Case law simply does not support applying an equitable apportionment to water use claims *unless all claimants have correlative rights*" (italics added)].)

Willis asserts the Physical Solution's equitable apportionment of the remaining native safe yield among overliers does "wholly disregard" Willis's correlative rights, in violation of *Barstow*'s admonition, because it extinguishes all *future* access by Willis to

43.

any part of the native safe yield in contravention of California law.  Certainly, California seeks to protect both actual uses and prospective reasonable beneficial uses by overliers.[11]  (See generally *Hillside Memorial Park & Mortuary v. Golden State Water Co.*, *supra*, 205 Cal.App.4th at p. 539.)  However, the protection of the interests of correlative rights holders who are actually using all available water for reasonable and beneficial purposes may (under appropriate circumstances) permit a court to craft a physical solution which recognizes the rights held by overliers but *subordinates* any future use by those correlative rights holders to their fellow correlative rights holders who are presently using the available supply.[12]

---

[11]Willis argues California law "clearly precludes extinguishing unexercised overlying water rights," citing *Tulare Dist. v. Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489 (*Tulare*), and subsequent authorities.  However, *Tulare* has limited relevance, because *Tulare* merely made clear that the reasonable and beneficial use doctrine requires that a court's judgment should protect future prospective uses by overlying landowners from being diminished by uses by *lower priority appropriators*:  "The new doctrine not only protects the actual reasonable beneficial uses of the riparian but also the prospective reasonable beneficial uses of the riparian.  As to such future … uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed ….  Therefore, as to such [future] uses, the trial court, in its findings and judgment, should declare such prospective uses paramount to any right of the appropriator."  (*Id*. at p. 525.)  While *Tulare* enjoins a court to craft its judgments to protect prospective overlying rights to water against potential claims of prescription by *appropriators*, and also declared invalid a provision of the Water Commission Act purporting to declare an overlying right is extinguished due to nonuse of that right (*Tulare*, at pp. 530–531), *Tulare* did not hold that California law precludes a court from restricting or subordinating unexercised overlying rights when necessary to accommodate *current* uses by *equal* priority claimants.

[12]Willis argues in their reply brief that *Tehachapi-Cummings*, *supra*, 49 Cal.App.3d 992 holds that an apportionment among correlative rights holders that gives existing users priority over unexercised correlative rights is improper.  However, *Tehachapi-Cummings* did not address equitable distribution in a comprehensive adjudication and (contrary to Willis's suggestion) does not constrain how apportionment must be designed.  Instead, *Tehachapi-Cummings* explained that, when "there is insufficient water for the current reasonable needs of all the overlying owners, many factors are to be considered in determining each owner's proportionate share" (*id*. at p. 1001) and that ascertaining the "proportionate share of each owner is predicated not on his past use over a specified period of time, nor on the time he commenced pumping, but solely on his *current* reasonable and beneficial need for water."  (*Ibid*., italics added.)  While *Tehachapi-Cummings* would be relevant to apportioning among *existing* users with *current* needs, it did not address apportionment between existing users and unexercised overlying rights.

In *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339 (*Long Valley*), our Supreme Court addressed a comprehensive water rights adjudication in the same circumstances as are present here: a water source that was being completely used but which had substantial unexercised claims upon it that were held by correlative rights holders. The *Long Valley* court held that prospective future uses of significant unexercised correlative water rights may be conditioned and subordinated to protect existing uses and reliance interests as part of a comprehensive water rights adjudication that allocated a limited water supply among competing claimants. (*Id*. at pp. 358–359.) In *Long Valley*, the court evaluated a riparian owner's challenge to the allocation by the State Water Resources Control Board (the Board), which allocated water to him for his ongoing irrigation of his riparian land but allocated no water for his prospective future use on his remaining undeveloped land. (*Id*. at p. 346.) The owner argued that foreclosing his future access to the water was improper because *Tulare*, *supra*, 3 Cal.2d 489 barred extinguishment of his prospective, unexercised portion of his riparian right merely to ensure water would remain available for other existing interests competing for the same inadequate supply. (*Long Valley*, *supra*, at pp. 353–354.) Rejecting that argument in part,[13] the *Long Valley* court held that article X, section 2 of the California Constitution authorized the Board "to decide that an unexercised riparian claim loses its

---

[13]The Board's order in *Long Valley* purported to entirely "extinguish" any unexercised riparian rights appurtenant to the landowner's remaining lands (*Long Valley*, *supra*, 25 Cal.3d at p. 346), which *Long Valley* observed was a "more difficult question." (*Id.* at p. 357.) The *Long Valley* court ultimately determined there was no "persuasive argument for concluding that complete extinction of such rights is necessary to the promotion of the reasonable and beneficial use of a stream system, nor … that the reasonable and beneficial use of the waters in the Long Valley Creek cannot be equally well promoted by placing limitations on [owners'] future riparian right other than complete extinction … such as the quantification of the future right, *or assigning to it a lower priority than all present and future actual reasonable beneficial uses made prior to the riparian's attempted use* [in the future]." (*Ibid*., italics added.) Thus, while *Long Valley* bars an adjudication which entirely extinguishes future overlying rights, it does not bar an adjudication which *preserves* those rights but *subordinates* them to present and future actual reasonable beneficial uses which arose prior to the dormant rights holder's attempt to use the supply.

45.

priority with respect to all rights currently being exercised." (*Long Valley*, at pp. 358–359.)  The court further held the Board could "also determine that the future riparian right shall have a lower priority than any uses of water it authorizes before the riparian in fact attempts to exercise his right." (*Id.* at p. 359.)  "In other words, [while state law does not] authoriz[e] the Board to extinguish altogether a future riparian right, the Board may make determinations as to the scope, nature and priority of the right that it deems reasonably necessary to the promotion of the state's interest in fostering the most reasonable and beneficial use of its scarce water resources." (*Ibid.*)

What does *Long Valley* make clear when there is a comprehensive adjudication in which a court is called upon to divide and allocate a limited water supply among competing equal priority users whose cumulative demands exceed the capacity of that resource?  It is that California law, although precluding any solution purporting to entirely extinguish  unexercised water rights, permits the court to determine "the scope, nature and priority of the [unexercised] right" as the court may "deem[] reasonably necessary to the promotion of the state's interest in fostering the most reasonable and beneficial use of its scarce water resources." (*Long Valley*, *supra*, 25 Cal.3d at p. 359.) The structure of the judgment and Physical Solution here comports with that approach. The court found that "[Willis's] members have an overlying right that is to be exercised in accordance with the Physical Solution herein."

The judgment thus recognizes (rather than entirely extinguishes) Willis's overlying future rights.  However, the court also required any future exercise of that preserved right be exercised "in accordance with the terms of the Physical Solution herein."  The Physical Solution, by allocating the remaining available native safe yield to holders of priority rights, effectively subordinated Willis's *future* exercise of their correlative rights (at least insofar as Willis sought to use water for nondomestic purposes) to the *present* exercise by correlative rights holders for existing domestic and nondomestic uses.  The Physical Solution left open the potential that Willis members

46.

could obtain access to native water for domestic uses on their overlying property and could draw water from the native safe yield for such purposes without any replacement assessment. We conclude the Physical Solution, by preserving but subordinating Willis's access to the native safe yield, comports with California law as construed and applied in *Long Valley*.[14]

Willis contends we should not assess the Physical Solution under *Long Valley* because the rationale of *Wright v. Goleta Water Dist.* (1985) 174 Cal.App.3d 74 (*Wright*) forecloses application of *Long Valley* in the present case. In *Wright*, the trial court applied *Long Valley* to subordinate the unexercised rights of overlying landowners below all active producers, including overlying users *and* appropriators. (*Wright*, *supra*, at p. 82.) The *Wright* court, reversing the judgment, concluded that even though the Constitution "applies to ground water as well as stream water and courts have enjoyed concurrent jurisdiction with the Board to enforce it [citation], absent a statutory scheme for a *comprehensive determination* of all ground water rights, the application of *Long Valley* to a private adjudication would allow prospective rights of overlying landowners to be subject to the vagaries of an individual plaintiff's pleading without adequate due process protections." (*Wright*, at p. 89.) *Wright* noted it rejected reliance on *Long Valley* to uphold the judgment before it because, unlike the *Long Valley* action, the judgment

---

[14]In *In re Water of Hallett Creek Stream System* (1988) 44 Cal.3d 448 (*Hallett Creek)*, our Supreme Court again upheld the authority to subordinate an unexercised correlative right to existing users of the water. There, the trial court's decree followed *Long Valley* by holding that, although the United States had riparian rights to the use of waters in the Hallett Creek Stream System, it had not yet exercised those rights and any future exercise of that dormant right could be subject to a later decree subordinating those correlatively held rights to other existing uses. (*Hallett Creek*, *supra*, at p. 471.) The *Hallett Creek* court followed *Long Valley* in creating the possibility that a future use might not be allowed: "Although, … the federal government's riparian rights may have theoretically 'attached' when the land was reserved from the public domain, the Board may nevertheless order such rights subordinated to appropriative 'rights currently being exercised,' and may further 'determine that the future riparian right [of the federal government] shall have a lower priority than any uses of water it authorizes before the riparian in fact attempts to exercise his right.' ([*Long Valley*, *supra*, ] 25 Cal.3d at p. 359.)" (*Hallett Creek*, *supra*, at p. 471.) The *Hallett Creek* court concluded "[t]his provision of the trial court's decree was fully consistent with the principles set forth in [*Long Valley*]." (*Id*. at p. 472.)

*Wright* reviewed arose from an action that was *not* a comprehensive adjudication in which all impacted owners had been given the opportunity to appear and defend their interests.[15]

In contrast to *Wright*, the trial court here found (and Willis does not contest) that the present action *was* a comprehensive adjudication under California law in which "all potential claimants to Basin groundwater have been joined [and] have been provided notice and an opportunity to be heard regarding their respective claim." We are convinced the due process concerns which undergirded the *Wright* court's rejection of the trial court's reliance on *Long Valley*—i.e., that a comprehensive adjudication allocating that resource would be improper unless all overlying owners received "notice and an opportunity to resist any interference with them [because a] court has no jurisdiction over an absent party and its judgment cannot bind him" (*Wright, supra,* 174 Cal.App.3d at p. 88)—has no application here. All potential overlying rights holders (including Willis)

---

[15]Willis appears to suggest in their reply briefs that *Wright* rejected application of *Long Valley* because there was no express legislative scheme delegating authority to courts to subordinate unexercised overlying rights, rather than because of the noncomprehensive proceeding examined in *Wright*. Accordingly, Willis suggests that the absence of a legislative delegation deprived the trial court here of authority to prioritize water rights among overliers in a manner which subordinated Willis's unexercised rights to those currently pumping. We disagree with Willis's reading of *Wright*. *Wright* extensively noted the principles relied on by Willis, i.e., the various courts stating "that rights of a riparian owner are not destroyed or impaired by nonuse, that the riparian right exists whether exercised or not, that a dormant riparian right is paramount to active appropriative rights, and that it may be proper for the trial court to retain jurisdiction over the matter so that the riparian's prospective right can be quantified at the time he decides to exercise it ([*Long Valley, supra,* ] 25 Cal.3d at p. 347)." (*Wright, supra,* 174 Cal.App.3d at p. 87.) After noting those principles, *Wright* stated, "'Such principles, however, are *limited in their application to a context in which water rights are determined through piecemeal adjudication* that will settle disputes among only a small number of those persons who claim a right to the use of water in a stream system. The judgment in this type of adjudication necessarily can bind only those who are parties to the litigation …. The most that a trial court can do in such a case, therefore, is to retain jurisdiction over prospective riparian claims.'" (*Ibid.*, italics added, quoting *Long Valley, supra,* at p. 347.) However, *Wright* then stated, "Although it is theoretically possible that judicial determination may provide complete resolution of water rights in an underground basin *this action did not purport to do so.*" (*Id.* at p. 88, italics added.) We read *Wright* as focused *not* on whether there was a legislative *delegation* of authority, but instead on whether the proceeding was a *comprehensive adjudication*.

had notice and opportunity to resist infringement upon their rights and are not "absent parties."

We conclude the present action constitutes the type of comprehensive adjudication to which the principles of *Long Valley* may be applied, which renders *Wright* inapposite. Willis cites *Barstow*, *supra*, 23 Cal.4th at page 1249, footnote 13, to argue *Barstow* approved *Wright*'s refusal to apply *Long Valley* in the absence of a comprehensive statutory scheme applicable to groundwater adjudications and, because no such statutory scheme was extant during the course of the present litigation, *Barstow* precludes application of *Long Valley* here. We reject Willis's reading of that footnote as precluding a court from applying *Long Valley* absent a statutory scheme. Instead, the *Barstow* court (after noting the *Wright* decision) went on to state: "Although we do not address the question here, *Wright* does suggest that, in theory at least, a trial court *could apply the Long Valley riparian right principles* to reduce a landowner's future overlying water right use below a current but unreasonable or wasteful usage, *as long as the trial court provided the owners with the same notice or due process protections afforded the riparian owners under the Water Code.* [Citations.]" (*Barstow*, *supra*, at p. 1249, fn. 13, italics added.) Willis does not suggest that they (or any other overlier) did not receive the protections of "the same notice or due process protections afforded the riparian owners under the Water Code" in the present comprehensive adjudication. We therefore conclude nothing in *Barstow* suggests the principles of *Long Valley* cannot be applied to the present proceeding.

We conclude, under *Long Valley* and *Barstow*, that equitable apportionment principles may be employed when determining how to allocate water among competing claimants with equivalent priorities as part of a physical solution addressing an overdrafted aquifer. We also conclude those cases permit a court, when crafting such a physical solution, to include provisions which subordinate (or otherwise condition) future uses by dormant rights holders to existing uses by other holders of equivalent priority, as

49.

long as that physical solution was entered after such subordinated parties were given notice and opportunity to participate in a comprehensive water rights adjudication proceeding, and the final physical solution appropriately recognizes and does not purport to wholly extinguish the correlatively held overlying rights of those subordinated dormant rights holders.

**B.     The Physical Solution's Allocation of the Native Safe Yield Does Not Violate California's Principles Promoting the Reasonable and Beneficial Use of Water**

An overarching consideration for any water rights adjudication is that the judgment should promote California's policy that available water be put to the maximum beneficial use possible, with waste or unreasonable use prevented, under the circumstances presented.  (*Barstow*, *supra*, 23 Cal.4th at pp. 1241–1242.)  *Barstow* explained this constitutional imperative requires that:

> "'[T]he trial court … determines[] whether [overlying rights holders], considering all the needs of those in the particular water field, are putting the waters to any reasonable beneficial uses, giving consideration to all factors involved, including reasonable methods of use and reasonable methods of diversion.…' ([*Tulare*, *supra*, ]3 Cal.2d [at pp.] 524–525 ….) We have reiterated these principles in subsequent cases, observing that although 'what is a reasonable use of water depends on the circumstances of each case, such an inquiry cannot be resolved *in vacuo* isolated from statewide considerations of transcendent importance.  Paramount among these we see the ever increasing need for the conservation of water in this state, an inescapable reality of life quite apart from its express recognition in the 1928 amendment.' (*Joslin v. Marin Mun. Water Dist.*[, *supra*, ]67 Cal.2d [at p. ]140, fn. omitted.)" (*Barstow*, at p. 1242.)

Willis contends the Physical Solution violates these principles in five ways:  (1) it allocates the available native safe yield on a permanent basis; (2) it grants certain of the parties the ability to transfer and/or carryover any allocated amount; (3) it was not based on an adequate evaluation of the reasonableness of each individual's existing use; (4) it awarded a small water right as an incentive award to the Wood representative; and (5) it

deprived Willis of any share of the native safe yield based on the assumption all future pumping by Willis's members would be unreasonable.

Willis first asserts allocating the native safe yield on a "permanent" basis *could* violate the "reasonable and beneficial use" requirement at some point in the future. Specifically, Willis argues that a particular user who received an allocation might change its current use from a currently "reasonable" use to a later "unreasonable" use, and there is no mechanism within the Physical Solution designed to detect such changed usages or to allow for modification of the allocations to prevent such unreasonable uses. Even assuming this claim is preserved,[16] the courts have recognized that physical solutions are designed "to achieve a *practical* allocation of water to competing interests." (*Barstow*, *supra*, 23 Cal.4th at p. 1250, italics added; accord, *Imperial Irrigation Dist. v. State Wat. Resources Control Bd.*, *supra*, 225 Cal.App.3d at p. 572.) Willis's implied suggestion that allocations may not have permanence but must instead be malleable appears inconsistent with achieving a "practical" allocation of water among competing interests. (*Ibid.*)

Indeed, other courts have implicitly concluded physical solutions may incorporate "permanent" allocations. (See generally *Long Valley*, *supra*, 25 Cal.3d 339; *Hallett Creek*, *supra*, 44 Cal.3d 448; *Pasadena*, *supra*, 33 Cal.2d 908.) Willis's contrary suggestion—that allocations must be subject to revisitation and relitigation at unspecified

_____

[16]It is axiomatic that a party who fails to object below forfeits its claim of error. (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations*, *Inc.* (2009) 171 Cal.App.4th 939, 950.) Willis has not directed our attention to that part of the record in which they objected below that the absence of a monitoring and adjustment system rendered the Physical Solution incompatible with California's "reasonable and beneficial use" requirement, which permits us to deem the argument forfeited. (*In re S.C.* (2006) 138 Cal.App.4th 396, 406–407 ["When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited"].) While the absence of timely objection below would ordinarily entirely bar Willis from raising this claim for the first time on appeal (*Save Our Heritage Organisation v. City of San Diego* (2015) 237 Cal.App.4th 163, 181), we nevertheless evaluate this claim.

51.

periodic intervals—is unsupported by any relevant legal authority. Willis cites dicta from *Joslin v. Marin Mun. Water Dist.*, *supra*, 67 Cal.2d at page 143 for the proposition that "'reasonable and beneficial use' determinations must constantly be reevaluated." *Joslin*, however, did not address the requirements of a valid physical solution, nor does it contain language suggesting a court must constantly revisit water rights adjudications.

Moreover, Willis's suggestion that the Physical Solution is fatally insufficient because the court is powerless to modify allocations to prevent subsequent unreasonable uses ignores section 6.5 of the Physical Solution. That section specifies the court has reserved "full jurisdiction … for the purpose of enabling the Court, upon a motion of a Party or Parties … to make such further or supplemental order or directions as may be necessary or appropriate to interpret, enforce, administer or carry out this Judgment *and to provide for such other matters as are not contemplated by this Judgment and which might occur in the future*, *and which if not provided for would defeat the purpose of this Judgment.*" (Italics added.) The declared purposes of the judgment and Physical Solution are: (1) to "further[] … the State Constitution mandate and the State water policy" and to "establish[] a legal and practical means for making the maximum reasonable and beneficial use of the waters of the Basin … in order to meet the reasonable and beneficial use requirements of water users in the Basin" (Physical Solution, § 7.1); and (2) to "provide flexibility and adaptability to allow the Court to use existing and future technological, social, institutional, and economic options in order to maximize reasonable and beneficial water use in the Basin." (Physical Solution, § 7.2.) Because these declared purposes include "maximiz[ing] reasonable and beneficial use of the waters," and the court retained jurisdiction to address matters that "might occur in the future, and which if not provided for would defeat *the purpose* of this Judgment" (italics added), there is adequate protection against potential future uses which might transgress the reasonable and beneficial use mandates.

Willis next asserts the transfer and carryover provisions offend the reasonable and beneficial use mandates of California water law. Willis cites no authority suggesting either the transfer or carryover provisions are per se invalid under California law.[17] Instead, Willis peremptorily argues that, if a correlative rights holder does not use his full allotment in any given year, the unused portion should be made available for use by Willis as a correlative right holder. Willis claims the transfer provisions allow any holder of an allotment to transfer his production rights "to a party with a water right inferior to [Willis], or even to a usurper with no water rights at all," and that the absence of any limits on how the transferee might use that water carries the potential to violate the reasonable and beneficial use mandate. However, Willis appears to misread the transfer provisions.

There *are* limitations on who can make or receive a transfer. For example, "[t]he pumping rights of Small Pumper Class Members are not transferable separately from the parcel of property on which the water is pumped, provided however a Small Pumper Class Member may move their water right to another parcel owned by that Small Pumper Class Member with approval of the Court." (Physical Solution, § 5.1.3.3.) As to the water allocated to the mutual water companies, it appears such production right may only be transferred (1) to or amongst *other* members of the Antelope Valley United Mutuals Group or (2) to a PWS who has assumed service to their member's shareholders. (Physical Solution, §§ 16.3, 16.3.1.) Further, while certain allotments may be transferred *to* nonoverlying production rights holders (i.e., the PWS as defined in exhibit 3, see Physical Solution, § 3.5.21) by overlying production rights holders for "use[] anywhere

---

[17]Willis, citing no California law barring such provisions, instead argues the stipulating parties "admitted" those provisions were void under California law. While the stipulating parties did recite that they agreed to provisions "only available by stipulation," including the transfer and carryover provisions, Willis ignores that those stipulating parties *also* agreed to a host of other offsetting provisions made available by the stipulation, including substantial cuts to water allocations "compared with what they claim under California … and … federal law," placing certain litigation burdens on the PWS, assigning certain fee obligations to the PWS, etc.

in the transferee's service area" (Physical Solution, § 16.2), such transfer would not result in a party with a water right *inferior* to Willis obtaining transferred water. More importantly, Willis does not articulate how the subsequent *use* of any water so transferred, either by a PWS for municipal purposes or by any of the other permissible transferees of equivalent priority, would necessarily offend the requirement that available water be reasonably and beneficially used by permissible transferees with priority rights equivalent to Willis's.

Willis next asserts the "carryover" provisions somehow violate the reasonable and beneficial use mandates of California law. Under section 15.3 of the Physical Solution, certain producers who do not use their full production right in any year may "carry over" its right to the unproduced portion for up to 10 years and (at the end of this 10-year period) may enter into a "storage agreement" with the watermaster to store unproduced portions. If the carryover water is not "converted" to a storage agreement, it "reverts to the benefit of the Basin" and the producer forfeits the unused allocation. Willis peremptorily contends this provision "ignores the mandate of the reasonable and beneficial use doctrine [that available water should] be put to beneficial use to the fullest extent to which they are capable," apparently because Willis contends that draining the basin of every available acre-foot in every given year is superior to flexibly managing available water supplies to adjust for wet and dry years. There was substantial evidence presented below articulating how these transfer and storage provisions *do* maximize putting *all* available water to beneficial use to the fullest extent possible.[18] The court

---

[18]Charles Binder, the civil engineer who acted as a watermaster for another watershed, testified how these transfer and carryover provisions of the Physical Solution further the goals of balancing and maximizing *all* available water supplies to meet the water requirements of users in the basin. He explained these provisions allow water users and the watermaster to coordinate the conjunctive use of all available water (both the native safe yield *and* available imported water to supplement the native safe yield) because it will encourage and facilitate the use of more *imported* water use during wet years (when imported water is more available for purchase by users) by allowing users to "bank" and later use available native safe yield groundwater to draw upon during dry years (when imported water would be less available).

found these carryover and transfer provisions were reasonable and beneficial, and essential in the management of the basin, precisely because many provisions of the Physical Solution (including allowing parties to store water) were "likely to lead to additional importation of water into the Basin and thus additional return flows which will help to restore groundwater levels in the Basin."

Willis next asserts the court adopted the Physical Solution without an "adequate" examination of whether the water allotments were being devoted to "reasonable and beneficial" purposes. We disagree. The court heard extensive evidence from two experts, Robert Beeby and Robert C. Wagner, who opined the parties who were presently using water (and received allocations from the native safe yield) were reasonably using the amounts of water they extracted and were devoting it to beneficial purposes.[19] Willis asserts this inquiry was "inadequate" because Beeby did not conduct an individualized inquiry of every pumper's use, methods of use, or the efficiency of the particular use in the context of an overdrafted basin relative to other overlying landowners. However, Willis cites no law suggesting the reasonable and beneficial use evaluation is prima facia inadequate without such an individualized and comparative analysis, nor did Willis proffer testimony suggesting any of the uses described by Wagner or Beeby as prevalent in the AVAA or as claimed by the overliers were "unreasonable" under applicable California law. We conclude the court's inquiry into the reasonable and beneficial uses of the water by the allotment holders was adequate and that the evidence supports the trial court's findings thereon.

[19]Beeby's testimony was supported by detailed spreadsheets, which used the data drawn from the evidence submitted during the Phase 4 trial, identifying numerous users' pre-rampdown average yearly pumping, the acres to which such water was applied, and identifying the claimed beneficial uses for such water. This data provided the basis for his conclusion that, with limited exceptions, the amounts drawn were being reasonably used for beneficial purposes. Wagner also reviewed the materials documenting the amounts of water historically used by the various parties and the types of uses to which they devoted that water, and opined (1) the *purposes* to which the parties to the Physical Solution historically applied their water were recognized beneficial uses under applicable California law, and (2) the *amount* of water used by them for such beneficial purposes fell within the appropriate parameters for such uses.

Willis next asserts the "incentive award" allocated to the Wood representative, in the amount of 5 afy, also violates California's requirement that water be reasonably and beneficially used.[20] Willis complains that this allotment was excessive in light of Wood's testimony as to his "needs," and this disconnect violates the reasonable and beneficial use limitations of California law. However, Wood testified he used somewhere between 3 to 4.5 afy, all of which he used for his 10-acre parcel. These amounts were consumed for his residence and to irrigate just one of his 10 acres. The evidence does not support Willis's claim that such an allotment was excessive in light of the evidence of Mr. Wood's "needs." Willis also complains the "excessive" allotment would likely be "sold for a substantial profit." However, the additional production right accorded to Wood specified it "shall not be transferable and is otherwise subject to the provisions of this Judgment," obviating this concern by Willis.

Willis finally claims the judgment and Physical Solution violate California's mandate seeking to promote the reasonable and beneficial use of water because it was approved based on the unsupported assumption that future use by Willis of the native safe yield would be "per se unreasonable." The court's findings, however, contained no determination that any and all future uses by Willis would constitute uses that were per se unreasonable or nonbeneficial. Instead, the court found the basin's available native safe yield was insufficient to support even the present level of pumping by correlative rights holders for their current reasonable and beneficial purposes and that the long-term health of the basin made long-range planning and investment essential to solving these overdraft conditions. The court concluded an essential precondition for such long-term planning and investment was certainty in the quantification of pumping rights. And, absent limits on Willis's future pumping (the amount of which was speculative and if unrestrained

---

[20]The Physical Solution allowed Wood's members to produce up to 3 afy, but the aggregate production for the entire class was limited to 3,806.4 afy. (Physical Solution, § 5.1.3.) However, "[i]n recognition of his service as class representative, Richard Wood has a Production Right of up to five [afy] for reasonable and beneficial use on his parcel." (*Id.*, § 5.1.3.8.)

could deprive long-established overlying production rights of any available native safe yield and render the present allocations legally meaningless), permitting unexercised rights to be exercised without limitation would "create an unacceptable measure of uncertainty and risk of harm to the public" (including Edwards Air Force Base, existing overlying pumpers and persons reliant on public water suppliers). It would also unreasonably inhibit the planning and investment necessary to solve the overdraft conditions in this basin. Thus, while the court did find Willis's future *needs* to be "speculative," and that allowing Willis access to the native safe yield with no limitations would unreasonably "create an unacceptable measure of uncertainty and risk of harm to the public," it did *not* find Willis's future *uses* would be per se unreasonable within the meaning of California's injunction that water be put to "reasonable and beneficial uses."

C.    **Willis's Miscellaneous Claims of Alleged Incompatibility Between California Law and the Judgment and Physical Solution**

Willis raises a host of other claims asserting the court's judgment and Physical Solution should be reversed because the court allegedly violated California law, both procedurally and substantively, when it adopted the Physical Solution.

Willis first argues California requires "'the trial court to admit evidence relating to possible physical solutions'" (quoting *City of Lodi v. East Bay Mun. Utility Dist.* (1936) 7 Cal.2d 316, 341), and contends the court violated this mandate when it refused to admit evidence of multiple alternative physical solutions proffered by Willis. However, the language cited by Willis does not mandate a trial court to admit evidence of *all* conceivable alternative physical solutions. Instead, the quoted language was the *Lodi* court's observation that, in the case before it, numerous alternative physical solutions were proposed at trial, none of which were acceptable to all parties, and "[t]he trial court apparently took the view that none of them could be enforced by it unless the interested parties both agreed thereto. That is not the law. Since the adoption of the 1928 constitutional amendment, it is not only within the power but it is also the duty of the trial court to admit evidence relating to possible physical solutions, and if none is satisfactory

to it to suggest on its own motion such physical solution. ([*Tulare*], *supra*, [3 Cal.2d] at p. 574.)  The court possesses the power to enforce such solution regardless of whether the parties agree." (*Lodi*, at p. 341.)

In context, *Lodi* merely held a court may and should consider adopting a physical solution whether or not all parties agree to it.  (Accord, *California American Water v. City of Seaside*, *supra*, 183 Cal.App.4th at p. 480 [courts have the power and duty to "suggest a physical solution where necessary, and they have 'the power to enforce such solution regardless of whether the parties agree'"].)  It did not hold a court must consider every proffered alternative physical solution.  Subsequent courts have described the trial court's duty as one that requires it to consider "whether there is *a* physical solution of the problem that will avoid waste and which will not unreasonably or adversely affect the rights of the parties" and "to work out, if possible, a physical solution, and if none is suggested by the parties to work out one independently of the parties." (*Rancho Santa Margarita v. Vail*, *supra*, 11 Cal.2d at pp. 558–559, citing *City of Lodi v. East Bay Mun. Utility Dist.*, *supra*, 7 Cal.2d at p. 341 and *Tulare*, *supra*, 3 Cal.2d at p. 575.)  Here, the court fulfilled its duty, and declining to admit evidence of Willis's alternative proposals did not violate that duty.

Willis also appears to argue various substantive provisions of the Physical Solution transgress California law, asserting:  (1) the new water production application procedure is so onerous as to constitute a "poison pill"; (2) the watermaster board as constituted creates a board membership that is inherently biased against Willis's members; (3) the fees for replacement water are "unfair" because they are not currently knowable; (4) Willis's members are deprived of "return flows" for water they "import"; (5) any unused amounts allocated to the United States for its "federal reserved rights" were improperly diverted to certain public water suppliers; (6) Willis's members were not treated equally with Wood's members; and (7) the so-called "drought provisions" are unfair.  Willis does not articulate how these provisions violate California water rights

laws, except insofar as Willis characterizes these provisions of the Physical Solution as "unfair." While we will consider these claims as part of our evaluation of whether the measures selected for inclusion into the Physical Solution constituted an abuse of discretion (see pt. VIII, *post*), Willis cites nothing to suggest any of these provisions are inherently violative of California's governing water rights law.

## VII

## THE PHYSICAL SOLUTION AND SETTLEMENT ARE CONSISTENT

Willis argues that, even assuming the Physical Solution is permissible under governing California law, the Settlement (and the court's entry of judgment on that Settlement) imposed an additional condition that constrained any final Physical Solution: that the Physical Solution be consistent with the terms of the Settlement. Willis asserts the Physical Solution is not consistent with the Settlement, and this separate violation mandates reversal. Willis also extensively argues principles of res judicata, equitable estoppel, and judicial estoppel precluded the PWS from seeking (or the court from entering) any judgment or Physical Solution that was inconsistent with the terms of the Settlement. While these bedrock principles are correct, and indeed respondents do not dispute these authorities, our conclusion the Physical Solution *is* consistent with the Settlement renders moot any extended discussion of these principles.

In order to assess the consistency between the Settlement and the ultimate 2015 judgment and Physical Solution, we must first examine what the Settlement and 2011 Judgment did and, of equal import, did not provide. Under the Settlement, the parties resolved the PWS's prescription claims against Willis: Willis agreed not to contest the PWS's entitlement to receive up to 15 percent of a specified amount of the native safe yield; the PWS agreed not to contest Willis's entitlement to their correlative share of the remaining 85 percent; and Willis acknowledged other overliers may have the right to share in that remaining 85 percent "correlatively with [Willis]." The parties also acknowledged a groundwater management plan was necessary to ensure that pumping

59.

from the basin did not exceed its safe yield; that the Settlement would become part of the Physical Solution entered by the court to manage the basin; that (upon completion of a seven-year "transition period") any pumping from the basin above the native safe yield would be subject to a replacement water assessment; and that any party pumping in excess of their annual share of the native safe yield would be responsible for paying for replacement water to cover that excessive pumping. Finally, the parties agreed "to be part of such a Physical Solution to the extent it is consistent with the terms of this [Settlement]," and to reserve the court's jurisdiction over Willis and the PWS for the limited purpose of merging their agreement into that Physical Solution.

Willis argues the judgment and Physical Solution should be reversed, based on the purported inconsistency of the Physical Solution with the Settlement, because the Physical Solution (1) does not allocate a portion of the native safe yield to Willis, (2) does not give their correlative rights in the 85 percent of the native safe yield any recognition, (3) improperly restricts them to pumping water for which they must pay a water replacement assessment, and (4) denies Willis the right to "imported water return flows" that was preserved by the Settlement. We review Willis's claims of inconsistency de novo. (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2016) 2 Cal.App.5th 1067, 1081.)

We reject Willis's first claim—that the Physical Solution is inconsistent with the Settlement because the former did not allocate a portion of the native safe yield to Willis—because nothing in the Settlement required the court (much less nonparties to the Settlement with competing correlative rights claims to the native safe yield) to allocate *any* portion of the native safe yield to Willis as part of the Physical Solution. Neither the Settlement nor the 2011 Judgment purported to determine the final amounts of the native safe yield (if any) that any subsequent Physical Solution would allocate to Willis under their correlative rights. To the contrary, the Settlement specifically recognized it "shall not … be construed to prejudice the rights, claims, or defenses of any persons who are

60.

not Settling Parties, or … to prejudice the rights, claims, or defenses (whether asserted or potential) of any Settling Party vis-à-vis any non-settling party." It further acknowledged there could be "a subsequent Court decision whereby the Court determines that [Willis's] Members do not have Overlying Rights." Willis specifically recognized the Settlement had no impact on how the court would subsequently resolve the *inter se* allocations among the correlative rights holders: in support of entry of the 2011 Judgment approving the settlement, Willis argued objections of various nonparties to approval of the settlement should be rejected precisely because "these non-parties lack standing to contest the proposed settlement where, as here, their legal rights are not prejudiced by it."[21]

We reject Willis's second claim—that the Physical Solution is inconsistent with the Settlement because the former did not give their correlative rights in the 85 percent of the native safe yield any recognition—for analogous reasons: the Physical Solution *does* acknowledge and preserve Willis's correlative rights, because the trial court's judgment stated it found "[Willis's] members have an overlying right that is to be exercised in accordance with the Physical Solution herein." The fact the Physical Solution requires Willis (along with all other correlative rights holders) to exercise their correlative rights

[21]For example, Willis explained why objections to the settlement interposed by the Antelope Valley Groundwater Association (AGWA) should be rejected, arguing "AGWA complains that the Settlement does not resolve potential subordination claims that AGWA or other landowners *could* assert in the future against members of the Willis Class. But, of course, consistent with the general principle that the Settlement does not prejudice the rights of non-parties, the Stipulation could not properly preclude AGWA from bringing such claims. This Settlement properly compromises only the claims and defenses asserted by the Settling Parties vis-à-vis each other. AGWA's hypothetical prescription claims will of necessity have to be dealt with when AGWA or others assert them. The fact that the Settlement does not resolve these hypothetical issues between the Class and other landowners does not in any way undermine the validity and efficacy of the Settlement. Moreover, the Settlement expressly provides that the Court retains jurisdiction over the Class for purposes of a future Physical Solution, which, presumably, will address these issues." Similarly, Willis (explaining why Bolthouse Farm's objection that the Settlement left unresolved the issue of "'subordination of the dormant landowners' pumping rights'" was meritless) argued the "Settlement merely includes the [PWS's] agreement not to contest the correlative rights of the Willis Class, but that agreement is not binding on Bolthouse or other non-settling parties."

under the conditions imposed by the Physical Solution is not inconsistent with the Settlement.

Willis's first two claims of inconsistency seek to transmogrify what the Settlement did—preserving Willis's correlative rights to a portion of the native safe yield *as against* the PWS prescriptive claims to that native safe yield—into a right to pump from the native safe yield *in derogation* of the correlative rights in the native safe yield held by nonsettling overliers. The judgment and Physical Solution are consistent with the Settlement because (1) Willis's correlative water rights *were* preserved, albeit under conditions where equitably apportioning the available native safe yield among *all* overliers required severe limits on pumping by all correlative rights holders (including Willis); and (2) it imposed subsidiary additional and necessary requirements on all correlative rights holders, including that all pumpers (including Willis) who exceed their allotted share of the native safe yield must pay for replacement water. Those limits and conditions are not inconsistent with the Settlement.

In describing the contemplated section V., "Management of the Basin," paragraph D. of the Settlement specifically provided:

> "The Settling Parties recognize the right of any Settling Party to produce groundwater from the Basin *above their share* of the Native Safe Yield, *subject to* the Physical Solution and to *any Replacement Assessment*. The Settling Parties agree to provide or purchase Imported Water for all groundwater pumping that exceeds a Settling Party's share of the Federally Adjusted Native Safe Yield. The Settling Parties agree that *any Settling Party who produces more than its annual share of the Federally Adjusted Native Safe Yield in any year will be responsible to provide Replacement Water or pay a Replacement Assessment* to the Watermaster so that the Watermaster can purchase Imported Water to recharge the Basin." (Italics added.)

These provisions demonstrate the Settlement contemplated that, if any party pumped groundwater in excess of their assigned share of the available native safe yield, they would be responsible for paying for replacement water, either by providing it themselves or by paying a replacement assessment to the watermaster to acquire replacement water.

62.

Willis next argues the Physical Solution is inconsistent with the Settlement because the trial court's findings on (and allocation of) return flow rights under the Physical Solution denied Willis the right to imported water return flows that was preserved to them under the Settlement.[22]  Although Willis did proffer an alternative Physical Solution with a different allocation of return flow rights, Willis cites nothing in the appellate record containing any objection at trial that the trial court's planned allocation of return flow rights was *inconsistent* with the Settlement.  Accordingly, this claim of error is not preserved.  (See fn. 16, *ante*.)  Moreover, even assuming the issue was preserved, we would reject this claim of "inconsistency" on its merits.  The Settlement provided only that each of the parties to the Settlement shall "have the *right to recapture Return Flows from Imported Water* that they put to reasonable and beneficial use in the Basin, *consistent with California law*."  (Italics added.)  Willis does not demonstrate that, assuming their future pumping required them to pay a replacement assessment to the watermaster, which in turn is used by the watermaster to purchase replacement water, Willis is entitled, "consistent with California law," to return flow rights generated by such replacement water.  We cannot conclude the Physical Solution's treatment of return flows from imported water is inconsistent with the Settlement.

Indeed, return flow rights ordinarily attach only to imported water.  The Settlement specifically defined "imported water," within the intent of the Settlement, to *exclude* water purchased via replacement assessments as "imported water."  (See Settlement, § III., ¶ J. ["Imported Water does not include water purchased by the Watermaster with Replacement Assessments"].)  Thus, it appears the parties to the Settlement agreed that, while they would retain the right to return flows to the extent they

---

[22]The court made specific findings on the allocation of return flow rights, finding that return flow rights exist with respect to foreign water brought into the basin which augments the Basin's groundwater, and concluding "the right to return flows from imported State Water Project water is properly allocated as set forth in paragraph 5.2 and Exhibit 8 of the Judgment and Physical Solution."

63.

imported water into the basin, they would *exclude* "replacement water" from the type of water qualifying as "imported water."

Willis appears to raise additional claims of inconsistency between the Settlement and the Physical Solution, albeit without developing those claims. For example, they complain the Physical Solution requires Willis to seek watermaster approval and "endur[e] a burdensome and expensive discretionary process" before they are entitled to pump any groundwater. Willis does not identify what part of the Settlement is inconsistent with the process for watermaster approval specified in the Physical Solution. To the contrary, the Settlement provided: "The Settling Parties agree that the Basin has limited water resources and that they should use their best efforts to conserve and maximize reasonable and beneficial use. The Settling Parties further agree that there is a need to create a groundwater management plan to ensure that pumping from the Basin does not exceed the Basin's Total Safe Yield and that the Court should appoint a Watermaster to oversee the management of the Basin's water resources." Willis does not explain how the contemplated "groundwater management plan" and appointment of a "Watermaster to oversee the management" is inconsistent with court-adopted regulatory provisions that aid the watermaster to monitor, manage and control extractions and replacements throughout the basin.

Willis's next asserted "inconsistency" is that the Physical Solution "restricts all pumping [by Willis] to imported replacement water … for which a replacement assessment must be paid, perhaps even for simple domestic use." Although Willis presumably is referring to the "New Production" procedures of the Physical Solution, Willis does not articulate how paying a replacement assessment for pumping above their allotted share of the native safe yield (as is required for every pumper) is inconsistent with the Settlement.

Willis next argues the Physical Solution is inconsistent with the Settlement insofar as they are disallowed from using any portion of the unused federal reserved right.

64.

Again, Willis cites nothing in the appellate record containing any objection at trial that denial of access to unused federal reserved rights was *inconsistent* with the Settlement, and therefore this claim of error is not preserved. (See fn. 16, *ante*.) Moreover, the Settlement only preserved to Willis a correlative share of 85 percent of the native safe yield after deduction of federally reserved rights. The Settlement did not, and indeed could not, mandate how either the federal government or the court allocated any unused portion of that right. Thus, the Physical Solution's allocation of any unused federal allotment was not inconsistent with the Settlement.

Finally, Willis argues the Physical Solution was inconsistent with the Settlement because the Physical Solution allocated more to the PWS than contemplated by the Settlement. Even assuming this claim was preserved below, Willis misreads the Settlement. The Physical Solution assigned 12,255 afy as the annual allocation of production rights to the PWS who participated in the settlement.[23] Willis agreed these settling PWS parties would be allocated up to 15 percent of the basin's adjusted native safe yield, which the Settlement defined as the annual native safe yield reduced only by the "actual annual production of the United States during the prior year," and Willis has not demonstrated that an assigned production right of 12,255 afy exceeded the Settlement's 15 percent limitation.

We conclude the scope and impact of the Settlement was limited. It only protected Willis's interest in the native safe yield, which was at that time undetermined, from being further eroded by the potential that the prescriptive interest in the native safe yield being asserted by the settling PWS might exceed 15 percent of the native safe yield. The parties acknowledged it did not and could not constrain the court in determining (as part of the contours of the Physical Solution) how the remaining 85 percent of the native

_____

[23]Although the amounts allocated to all public water suppliers as production rights (as included in exhibit 3 of the Physical Solution) was 12,345 afy, we necessarily exclude the 90 afy production rights allocated to Boron Community Services District and West Valley County Water District because they were not among the PWS who were parties to the Settlement.

safe yield might ultimately be equitably apportioned among all correlative rights holders. Accordingly, and for the foregoing reasons, we reject Willis's claim that the 2015 judgment and Physical Solution was inconsistent with the Settlement.

## VIII

## WILLIS FAILS TO SHOW THE PROVISIONS CONTAINED IN THE PHYSICAL SOLUTION WERE AN ABUSE OF DISCRETION

As discussed above, when "[a] trial court exercises its equitable powers in approving a physical solution and entering the judgment, … review of that judgment is under the abuse of discretion standard of review." (*Hillside Memorial Park & Mortuary v. Golden State Water Co.*, *supra*, 205 Cal.App.4th at p. 549; see *Barstow*, *supra*, 23 Cal.4th at p. 1256.) A component part of the Physical Solution here, as elsewhere, can include allocating water to the competing claimants. (See generally *Long Valley*, *supra*, 25 Cal.3d 339; *Pasadena*, *supra*, 33 Cal.2d 908; *Barstow*, *supra*, at p. 1250 ["a trial court may impose a physical solution to achieve a practical allocation of water to competing interests"].) A court is entitled to employ equitable apportionment principles in crafting how to allocate production rights in the available native safe yield among the competing correlative rights holders. (*Barstow*, at pp. 1248, 1249 ["within limits, a trial court may use its equitable powers to implement a physical solution"].) We therefore examine whether Willis has shown the structure imposed by the Physical Solution here, including the allocations of the available native safe yield, was an abuse of the trial court's discretion. (*Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 566 ["The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown … a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power"].)

### A. The Court's Findings

The trial court found (and Willis does not dispute) that a "physical solution … is required now" to arrest the chronic overdraft conditions that had plagued the basin for

decades and that threatened continued harm to the basin. It further found the "parties cannot continue to exercise their overlying rights in an unregulated manner because that will continue to harm the Basin." Accordingly, the court found that, because of the basin's severe overdraft and remaining undeveloped land, "existing pumping must be limited and constraints on new pumping are required" to protect the basin and the public at large and that "water allocations and reasonable conditions on new pumping are required in the Physical Solution."

The court's final allocations of the available native safe yield, and the reasons it made those allocations, were extensively explained in its judgment. It first articulated why each of the parties receiving allocations had established their priority basis for obtaining some allocation of the native safe yield (as holders of federal reserved rights, prescription rights, or overlying rights), and explained why protection of the long-term health of the basin required allocation of the native safe yield. The court then found the overliers who received allocations had historically used water for reasonable and beneficial uses in a collective amount exceeding the total native safe yield. It also found:

> "[T]he amounts allocated to each of these parties under the Judgment and Physical Solution are reasonable and do not exceed the native safe yield. [¶] The Court finds that the Landowner Parties and the Public Overliers will be required to make severe reductions in their current and historical reasonable and beneficial water use under the physical solution. The evidence further shows that the Basin's native safe yield alone is insufficient to meet the reasonable and beneficial uses of all users, so the Court must allocate quantities for each party's present use. The Court therefore finds that there is substantial evidence that all allocations of groundwater in the Physical Solution … will effectively protect the Basin for existing and future users [and] [¶] … make maximum reasonable and beneficial uses of the native safe yield … as required by the California Constitution."

The court further articulated why it concluded the Physical Solution, while acknowledging Willis's overlying rights, fairly and justly apportioned the available native safe yield even though it contained no current or reserved allocation for the dormant rights held by Willis:

"[T]he Court has authority to reasonably limit or burden the exercise of [Willis's] overlying rights. [¶] … [T]he Court finds multiple grounds to condition the unexercised overlying rights of the Willis Class. Because the landowners' reasonable and beneficial use pumping alone exceeded the native safe yield while public water supplier pumping was taking place, the unexercised overlying rights of the Willis Class are not entitled to an allocation in the Physical Solution. If that were not required under these circumstances in this Basin, the Court finds that the pumping here by Landowner Parties, Public Overliers and the Small Pumper Class would become legally meaningless because all [of Willis's] unexercised overlying rights could eliminate long-established overlying production. [¶] … [¶] [T]he Court [also] finds that the Basin requires badly needed certainty through quantifying all pumping rights, including overlying rights. The Court finds that the Willis Class overlying rights cannot be quantified because they have no present reasonable beneficial use; their future groundwater needs are speculative; substantial evidence shows that the Basin's groundwater supply has been insufficient for decades; and unexercised overlying rights create an unacceptable measure of uncertainty and risk of harm to the public including Edwards Air Force Base, existing overlying pumpers and public water supplier appropriators. This uncertainty and risk unreasonably inhibits critically-needed, long-range planning and investment that is necessary to solve the overdraft conditions in this Basin. [¶] … The Court finds that the unique aspects of this Basin explained below and its chronic overdraft conditions prevent the Willis Class from having unrestricted overlying rights to pump Basin groundwater."

The court explained why it concluded the Physical Solution, in all its component parts (including the limits placed on Willis's dormant rights), met the goals of and strictures on physical solutions:

"[T]he Court must impose a physical solution that limits groundwater pumping to the safe yield, protects the Basin long-term, and is fair and equitable to all parties. The Court's Physical Solution meets these requirements. It severely reduces groundwater pumping, provides management structure that will protect the Basin, balances the long-term groundwater supply and demand, and limits future pumping by management rules that are fair, equitable, necessary and equally applied to all overlying landowners.

"The Court also notes that the Willis Class does not presently pump any groundwater and thus, has no present reasonable and beneficial use of water. The Court finds it would be unreasonable to require present users to further reduce their already severely reduced water use to reserve a supply

68.

of water for non-users' speculative future use.  Here, quantification of overlying rights is necessary because there is a present need to allocate the native supply.  Accordingly, the Landowner Parties, Public Overliers and Small Pumper Class are entitled to continue their significantly reduced production of the native or natural safe yield as set forth in the Physical Solution.  [Citation.]

"The Court finds that without reasonable conditions upon the exercise of overlying right in this overdrafted Basin, the Willis Class members' unrestricted right to exercise of the overlying right during shortage conditions would make it impossible to manage and resolve the overdraft conditions under the unique facts of this Basin and '[t]he law never requires impossibilities.'  (Civ. Code, § 3531.)  The Court therefore finds that the Willis Class members have an overlying right that is to be exercised in accordance with the Physical Solution herein."

## B.    Analysis

Willis argues the components of the Physical Solution had numerous "shortcomings" and appears implicitly to argue these elements, viewed either individually or collectively, show the court abused its discretion in imposing this Physical Solution.

Willis's principal claim is that the absence of any present allocation of the native safe yield to accommodate future exercise of their dormant rights was an abuse of discretion.  We have already concluded a court may employ equitable apportionment principles when allocating available water among claimants holding correlative rights (*Barstow*, *supra*, 23 Cal.4th at p. 1248), and that restrictions on future unexercised correlatively held rights are within the range of options available.  (*Long Valley*, *supra*, 25 Cal.3d at pp. 358–359; cf. *Barstow*, *supra*, at p. 1249, fn. 13.)  The trial court explained why resort to that option was necessary here:  long-range planning for and investment in measures to protect the basin would be harmed absent certainty from quantified pumping rights, and Willis's speculative needs would frustrate those goals.  Moreover, existing users were already subjected to severe reductions, and the economy of the region (premised on the existing reduced uses) would be subjected to an unreasonable measure of uncertainty if existing users' allotments were subject to the vagaries of

69.

dormant rights claims. We cannot conclude these factors were impermissible considerations for the trial court when it determined how to equitably apportion the limited native safe yield. (Cf. *Barstow*, at p. 1246 [equitable apportionment can consider many factors when making the """"delicate adjustment of interests which must be made"""" for an overdrafted water source, including the extent to which the economy of the region may be rooted in existing uses].) We therefore conclude Willis has not shown the allocations here were an abuse of discretion.

Willis also criticizes other aspects of the Physical Solution to assert the trial court abused its discretion when imposing the Physical Solution here. For example, the new production application procedure, which applies to anyone (including Willis) seeking permission to commence new pumping from the overdrafted basin, requires the watermaster engineer to determine whether the applicant has "established the reasonableness [of its proposed extraction and use of the groundwater] in the context of all other uses of Groundwater in the Basin, at the time of the application, including whether all of the Native Safe Yield is then currently being used reasonably and beneficially." The application procedure includes (1) paying a fee for application review, investigation, reporting and hearing, and any costs incurred by the engineer; (2) providing written summaries describing quantity, source, and manner and place of use; (3) providing maps depicting the location of the new production; (4) providing a copy of well permits, well log reports, testing results, pump and meter specifications; (5) providing written confirmation of land use entitlements; (6) providing written confirmation of California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) requirements; (7) providing an approved water conservation plan; (8) providing an economic impact report, a physical impact report, and a "no material injury" statement; (9) providing an agreement to pay the applicable replacement water assessment; and, (10) any other information the watermaster engineer may require.

70.

Willis argues that, while they *are* allowed to apply for permission to pump from the basin, the new water production application procedure is so costly, onerous, and uncertain that it could remove any realistic economic possibility for developing their property. However, we cannot conclude the trial court abused its discretion by requiring an applicant to provide basic information necessary to promote effective management of the basin and to guard against future overdraft. (Cf. *Tulare*, *supra*, 3 Cal.2d at p. 525 [holding "trial court might well, by appropriate provisions in its judgment, retain jurisdiction over the cause, so that when a riparian [or overlier] claims the need for water, … the trial court may determine whether the proposed new use, under all the circumstances, is a reasonable beneficial use and, if so, the quantity required for such use"].)

The required information allows the watermaster engineer to determine whether new production is reasonable "in the context of all other uses of Groundwater in the Basin at the time of the application, … [c]onsidering common law water rights and priorities, the mandate of certainty in Article X, section 2, and all other relevant factors." The information also allows the watermaster engineer to meet its responsibility to "rely on and use the best available science, records and data to support the implementation of this Judgment." We cannot conclude that imposing requirements on new production applicants to provide the information needed by the watermaster engineer to effectively manage the basin's scarce water, and to enable the watermaster to evaluate proposed new pumping in order to make informed decisions on all proposed new demands placed on the basin's overtaxed groundwater, was an abuse of discretion.

Willis also asserts the watermaster board as constituted creates a board that is inherently biased against Willis because no class member serves on that board. This claim is speculative. (See, e.g., *Independent Roofing Contractors v. California Apprenticeship Council* (2003) 114 Cal.App.4th 1330, 1340 ["[B]ias in an administrative adjudicator must be established with concrete facts rather than inferred from mere

71.

appearances"].)  Moreover, there are numerous safeguards protecting against the risk of biased decisionmaking by the watermaster board, including the court's continuing jurisdiction and oversight.

Most watermaster board decisions must be unanimous, thus preventing any one group from dominating its decisionmaking process.  Their meetings are *also* subject to the transparency protections provided under the Ralph M. Brown Act (Gov. Code, § 54950 et seq.) open meeting provisions.  The watermaster is also enjoined to "carry out its duties, powers and responsibilities in an impartial manner without favor or prejudice to any Subarea, Producer, Party, or Purpose of Use," and the court's continuing jurisdiction includes the "authority to remove any Watermaster … upon a showing that the Watermaster has … performed its powers in a biased manner."

Willis also appears to complain that conferring discretionary authority on the watermaster to approve or deny applications, even after considering the watermaster engineer's recommendation, was an abuse of discretion.  However, there would be little point in having the watermaster engineer's recommendations be subject to review by the watermaster if the watermaster lacked discretionary authority to act on such applications notwithstanding the watermaster engineer's recommendations.  Moreover, because all watermaster decisions are reviewable by the court under its continuing jurisdiction and oversight, new production applicants are protected from arbitrary decisionmaking.[24]

Willis asserts the replacement water fee is "unfair" because the *amount* of the fee is not ascertainable from the four corners of the Physical Solution.  However, the Physical Solution defines the replacement water assessment as the "amount charged by

---

[24]Willis also argues, for the first time in their reply brief, that the new production procedures were an abuse of discretion because they transgress Water Code sections 106 and 106.3, which declare that domestic uses have priority and that everyone has the "right to safe, clean, affordable, and accessible water adequate for [domestic household uses]."  (Wat. Code, § 106.3.)  According to Willis, the costs for and uncertainty of the new production application procedures frustrate this policy.  Even assuming this argument was interposed below, we decline to consider this claim.  (*Hernandez v. First Student*, *Inc.* (2019) 37 Cal.App.5th 270, 277–278 [court of appeal ordinarily will not consider arguments raised for first time in reply brief].)

the Watermaster to pay for all costs incurred by the Watermaster related to Replacement Water." While the "costs incurred by the Watermaster" will undeniably vary over time (because the charges the watermaster will incur to acquire imported or other replacement water presumably will not be fixed), Willis cites no basis for concluding that a provision allowing the watermaster to pass those costs through to the ultimate user was an abuse of discretion.

Willis also argues, for the first time in its reply brief, that the Physical Solution's effort to protect their ability to develop their lands via the new pumping application procedure is "illusory" because it depends on the availability of imported water from an "infamously unreliable source," rendering the "likelihood of available imported water … very low" and therefore Willis's members "will not be able to develop their land." Even assuming we were to consider this argument (but see fn. 24, *ante*), Willis's citations to the record for the evidence supporting the factual predicates—that imported water is from an "infamously unreliable source" and the "likelihood of available imported water is very low"—does not support their argument. Instead, they cite only to a proffered opinion (from their proposed appraiser) that "there is no guarantee that any imported replacement water would be available in any given year," which (in addition to being an "opinion" well outside the expertise of this proffered expert) does not support the argument that the likelihood of *any* available imported water is so low as to render the new production application procedure "illusory."

Willis next argues it was an abuse of discretion to allocate to certain PWS's any unused amounts that were allocated to the United States for its "federal reserved rights" but that had not been consumed by the United States during the previous year. However, the predicate for this contention appears to be that permitting unused federal allotments to flow to the PWS improperly directs available water away from higher priority overliers to lower priority appropriators. As previously discussed, there was substantial evidence supporting the conclusion the PWS had acquired interests in the available native safe

73.

yield of equivalent priority to overliers, and therefore the predicate upon which this claim by Willis rests is without merit.

Finally, Willis argues the so-called "drought provisions" were an abuse of discretion.[25] Willis claims these provisions improperly elevated the PWS's rights above overlying landowners' rights to available groundwater supplies and further argues this provision required special scrutiny by the trial court because it was an improperly collusive agreement representing a quid pro quo for the PWS's agreement to pay Wood's attorney fees. Our examination of the drought provisions convinces us this provision was within the trial court's discretion in fashioning the overall Physical Solution.[26]

Under the Physical Solution, all users (including the PWS) must drastically reduce groundwater production, even during periods of severe drought. As additional assurance the PWS could continue to provide a reliable water supply to hundreds of thousands of urban customers during the rampdown period, the Physical Solution included a drought program. The drought program, which was in effect only during the seven-year rampdown period, appears designed to incentivize the funding for purchasing all available imported water supplies while concomitantly minimizing the incentive for

---

[25]Willis also argues on appeal it was an abuse of discretion to treat Willis's members disparately from Wood's members. Willis has not demonstrated this claim was preserved below, and we therefore deem it waived. (See fn. 16, *ante*.) Even assuming this claim was preserved, there was substantial evidence upon which a court could conclude Willis's members were not similarly situated with Wood's members: the latter had commenced pumping and hence were extant users. Moreover, Wood's members received an allotment from the native safe yield that was, on average, only 1.2 afy. To the extent such a de minimus allotment was sufficient only to support domestic household needs, Willis's members have not facially received disparate treatment from Wood's members because the watermaster can waive replacement assessments for similar pumping from the native safe yield for similar purposes.

[26]Willis also appears to assert that granting the PWS up to 40,000 acre-feet over a seven-year period, as partial consideration for the PWS agreement to pay Wood's attorney fees and costs, was "clearly excessive" under class action settlement principles. (*Cellphone Termination Fee Cases* (2009) 180 Cal.App.4th 1110, 1117–1118 [court must carefully examine settlement of class action to ensure it is fair, reasonable and adequate].) However, Willis does not demonstrate that the drought program/fee award was so disproportionate as to be "clearly excessive," and we do not further address this aspect of Willis's claim.

excess groundwater production.  Before the participants can claim the program *benefits* (i.e., excess groundwater production without replacement assessments), the program imposed *requirements*:  first, in *each* year of the seven-year rampdown, District 40 must purchase 70 percent of District 40's total annual demand (up to 50,000 afy) or as much as is available up to that amount; second, all program participants must first exhaust all other available water supplies (including all water made available by Antelope Valley– East Kern Water Agency, plus all their respective production rights in the native safe yield, their return flow rights, any unused production allocation of the federal reserved water rights, and production rights previously transferred from another party).  Only if and after these conditions are satisfied *and* there were still insufficient surface water supplies available to meet the needs of the public users may the participants pump additional water (to a maximum total of 40,000 acre-feet over the seven-year period) without paying the replacement assessment.

Willis's claim that this program was an abuse of discretion focuses solely on the *potential* availability of 40,000 acre-feet of additional production, while ignoring the significant limitations and offsetting costs and responsibilities.[27]  Because the court could conclude the drought program was a creative component of the overall solution to the problems of groundwater management—by incentivizing and maximizing the importation and use of surface water when available while limiting additional groundwater production unless absolutely vital to meet public water demands—the court acted within its sound discretion in providing a temporary program that allows some production free of replacement water in dry years and purchase of additional imported water to supplement the basin's native supply in other years.

---

[27]Willis also asserts this program was an abuse of discretion because it gave 40,000 acre-feet to lower priority rights holders and thus necessarily deprived overliers of their right to those 40,000 acre-feet.  However, the judgment recognized the PWS had water rights of *equal* priority with overliers, and hence did not circumvent water rights *priorities*.  Moreover, even to the extent the PWS *did* pump under the drought program, nothing in the Physical Solution offsets such pumping by *diminishing* the production rights of any other overlier.

We conclude the terms and provisions of the Physical Solution were well within the equitable discretion accorded to trial courts when fashioning a physical solution, and therefore reject Willis's claims it represented an abuse of that discretion.

## IX

## WILLIS WAS ACCORDED DUE PROCESS

Willis finally asserts the trial court violated their due process rights by entering *any* judgment adversely affecting their correlative rights, and by the limits it placed on their participation in the post-Settlement proceedings. We will address Willis's claims seriatim.

### A. Willis Received Adequate Notice and Opportunity to Appear and Defend Their Interests

Willis first asserts they were deprived of property without due process. Specifically, they argue that because no party filed an adversarial pleading against them giving them notice that their correlative overlying rights in the native safe yield would be litigated and resolved as part of this proceeding, *any* judgment apportioning pumping rights in the native safe yield among correlative overliers denied due process to Willis. Certainly, due process requires that a party be given notice and an opportunity to defend his interests (*Britz, Inc. v. Dow Chemical Co.* (1999) 73 Cal.App.4th 177, 181), but the "primary purpose of procedural due process is to provide affected parties with the right to be heard at a meaningful time and in a meaningful manner. Consequently, due process is a flexible concept, as the characteristic of elasticity is required in order to tailor the process to the particular need. [Citations.] … 'What due process does require is notice reasonably calculated to apprise interested parties of the pendency of the action affecting their property interest and an opportunity to present their objections.'" (*Ryan v. California Interscholastic Federation–San Diego Section* (2001) 94 Cal.App.4th 1048, 1072, quoting *Bergeron v. Department of Health Services* (1999) 71 Cal.App.4th 17, 24.)

Willis's argument on appeal also mistakenly suggests no action was ever filed against its members, and that the only pleading involving its members was filed by Willis

76.

and against the PWS.  While no separate complaint was filed against the class *after* its certification, the Settlement acknowledged District 40 *had* brought an action "against Overlying Owners (more specifically defined in III.M) in the Basin … seeking, inter alia, an adjudication of their respective rights to produce groundwater from the Basin." Because section III.M of the Settlement defined "Overlying Owners" to mean "owners of land overlying the Basin who hold an Overlying right" that (presumably) included all members of the Willis class, there *was* an adversarial action against class members seeking an adjudication of their respective rights to produce groundwater.

Indeed, the lack of a pleading by every party against every other party in a groundwater adjudication is not unique.  Thus, in *Pasadena*, *supra*, 33 Cal.2d 908, the court rejected an appellate claim analogous to the one Willis now raises:  that the trial court improperly enlarged the scope of the proceedings beyond the strict boundaries of the appellant's pleading to encompass not merely the appellant's pleaded rights as against the named defendants but to also include "'an adjudication of rights of the defendants *inter se* and the rights of each and every party as against each and every other party.'" (*Id.* at p. 919.)

> "Although the answers of the respective defendants did not present claims against the other defendants and were not served on them, the action was tried on the theory that these matters were at issue, and the ensuing judgment limiting the amount of water that each could pump was also based on this theory.  … It was within the discretion of the trial court to determine whether it was necessary to adjudicate *inter se* the amount of water to which each party was entitled, and the record indicates that it would have been impracticable to decide the matter solely between plaintiff and each defendant.  Moreover, appellant had ample time to prepare its case after notice of the scope of the proceedings, and there is no basis for any claim that it was misled to its prejudice or that it was denied due process of law." (*Ibid*.)

We are convinced Willis was not deprived of procedural due process.  The consolidated actions included District 40's action which sought, among other relief, a physical solution and "a judicial determination as to the Basin's safe yield, the quantity of

surplus water available, if any, the correlative overlying rights of each cross-defendant to the safe yield and an *inter se* determination of the rights of persons an[d]/or entities with overlying, appropriative and prescriptive rights to pump water from the Basin."

Moreover, the parties specifically contemplated their Settlement would become part of the Physical Solution entered by the court to manage the basin, and Willis agreed to be part of that Physical Solution "to the extent it is consistent with [the Settlement]," including that a settling party's production rights would be subject to the Physical Solution.  The parties also acknowledged the court might subsequently determine Willis did not have overlying rights, or that other overlying users may have the right to pump correlatively with Willis, and that the Settlement provided for the court to retain jurisdiction over Willis's members for further proceedings, "including the entry of a Physical Solution if appropriate."

Finally, the court's consolidation order specified (1) it would not "preclude any parties from settling any or all claims between or among them, *as long as any such settlement expressly provides for the Court to retain jurisdiction over the settling parties for purposes of entering a judgment resolving all claims to the rights to withdraw groundwater* from the Antelope Valley Groundwater Basin as well as the creation of a physical solution if such is required upon a proper finding by the Court," and (2) an approved settlement would be "incorporat[ed] and merg[ed] … into a comprehensive single judgment containing such a declaration of water rights and a physical solution." (Italics added.)  Under these circumstances, we conclude Willis's claim that the absence of a formal pleading against them deprived the court of jurisdiction to adjudicate their correlative rights as against other overliers is meritless.

When the court issued its consolidation order in 2010, it gave notice to all parties (including Willis) that "the only cause of action that would affect all parties to the consolidation are the declaratory relief causes of action which seek a declaration of water rights (by definition, correlative rights).  If the basin is in overdraft (a fact still to be

established), the Court in each declaratory relief proceeding would of necessity have to look at the totality of pumping by all parties, evaluate the rights of all parties who are producing water from the aquifer, determine whether injunctive relief was required, and determine what solution equity and statutory law required (including a potential physical solution)." Here, as in other cases (see *Pasadena*, *supra*, 33 Cal.2d 908), the court had the discretion to consolidate all actions and conduct a comprehensive adjudication, it gave notice to Willis that later proceedings could encompass an adjudication of the *inter se* amounts of water to which each party was entitled, and the Settlement was entered into cognizant of the *inter se* nature of the judgment into which the Settlement would ultimately be merged.

Willis correctly notes that in rem or *inter se* adjudications are still subject to due process protections. (See generally *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 312–313; *Robinson v. Hanrahan* (1972) 409 U.S. 38, 39–40 [in rem nature of proceeding does not obviate due process requirements that party be given notice "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'"].) However, none of the cases cited by Willis involved actions in which the aggrieved party had actually appeared or had settled the claims against him by consenting to entry of a subsequent judgment consistent with his settlement, and hence provide no assistance to Willis's procedural due process attack on the present judgment. For example, Willis relies on *Griffin v. Griffin* (1946) 327 U.S. 220, where the state court had entered an interlocutory judgment requiring alimony to be paid (*id*. at p. 223), and the wife later sought and received a monetary judgment for unpaid alimony without actual notice to (or appearance by) the husband in the later proceedings at which he was entitled to present any defense he might have had to the later judgment. (*Id*. at p. 228.) The Supreme Court held that due process required notice of the proceeding even though the decree indicated

that "further proceedings might be taken to docket in judgment form the obligation to pay installments accruing under the decree." (*Id*. at p. 229.)

Here, Willis *was* given notice and the opportunity to appear and raise their defenses to the final judgment, and in fact did so: Willis deposed expert witnesses, filed pretrial motions and oppositions, offered witness testimony and cross-examined witnesses at the Phase 6 trial, and interposed numerous objections to the statement of decision and to the Physical Solution. Accordingly, *Griffin* has no application, and the court did not violate Willis's procedural due process rights.

## B        The Evidentiary Rulings Did Not Deprive Willis of Due Process

Willis argues they were denied due process because the court's evidentiary rulings denied them any meaningful opportunity to participate in the Phase 6 proceedings. Willis correctly notes that, under certain circumstances, a lower court's erroneous rulings excluding evidence can deny a party a fair trial and require per se reversal. (See, e.g., *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 677.) However, the *Kelly* court reached that conclusion because it held the evidentiary rulings (1) were erroneous and (2) completely foreclosed the plaintiffs from pursuing the only factual theory of liability supported by the evidence. (*Id.* at pp. 677–678.) Willis has not shown that either prong of *Kelly* is satisfied here.

First, although Willis lists the trial court's evidentiary rulings with which they disagree, they make no effort on appeal to demonstrate those rulings *were* an abuse of discretion. (See *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446–447 [trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse of discretion]; *Caloroso v. Hathaway* (2004) 122 Cal.App.4th 922, 928 [appellate court may not disturb trial court's ruling on admissibility of opinion evidence absent an abuse of discretion].) For example, Willis complains the trial court excluded the testimony of Dr. Smith on grounds that it was irrelevant. Willis's proffer was that Dr. Smith would provide expert testimony on, among other things, three alternative models for physical

solutions that would include allocations for Willis, and on alleged inconsistencies between the Settlement and the Physical Solution from an economic perspective. The parties objected that his testimony sought to improperly opine on legal questions, and on relevancy and Evidence Code section 352 grounds. The court sustained the objections to Dr. Smith's testimony and precluded him from testifying.

To the extent Willis asserts on appeal that excluding Smith from discussing alternative models for physical solutions was error, we have already rejected the premise that a trial court is obligated to consider alternative physical solutions and therefore we necessarily reject Willis's claim that excluding the expert from discussing those alternatives was an abuse of discretion. To the extent Willis asserts on appeal that excluding Smith from discussing "inconsistencies" between the Settlement and the Physical Solution was error, Willis makes no appellate argument that such testimony was exempted from the ordinary rule that experts may not opine on the legal impact of agreements. (See generally *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1179–1185.) We conclude Willis has not shown the ruling as to Dr. Smith was error.

Willis also argues they were prejudiced because the court erroneously limited the testimony from a witness (Stephen Roach) proffered by Willis as an expert appraiser. Prior to his testimony, several parties objected to the testimony based on relevance and undue prejudice pursuant to Evidence Code section 352. In response to the court's request for an offer of proof, Willis stated Roach would opine on "what happens to the value of property if this proposed physical solution is entered and why." (Capitalization omitted.) The court, after noting that "everybody acknowledges" that imposing conditions and restrictions has a "negative impact on the property," struggled "to understand why it's necessary for us to go into detail as to what those economic impacts might be since it cannot impact the court's decision." (Capitalization omitted.) The court nevertheless allowed limited testimony from Roach, who opined the Physical Solution would negatively impact property values and expressed his reasons for that opinion.

Willis does not identify what relevant evidence was erroneously excluded by the time limits placed on Roach's testimony, much less that it is reasonably probable a more favorable result would have occurred had this missing evidence been admitted. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) Because the court already expressed its awareness that physical solutions have economic impacts, we cannot conclude Willis has carried its appellate burden to show either error or prejudice.

Willis also asserts they were improperly constrained in cross-examining witnesses. Certainly, "'[a]ll parties must be … given [an] opportunity to cross-examine witnesses … and to offer evidence in explanation or rebuttal'" (*Massachusetts etc. Ins. Co. v. Ind. Acc. Com.* (1946) 74 Cal.App.2d 911, 914), and where "a party is completely denied the fundamental right to cross-examine the adverse party, there has not been a fair hearing." (*Ogden Entertainment Services v. Workers' Comp. Appeals Bd.* (2014) 233 Cal.App.4th 970, 984.) However, Willis was not completely denied the opportunity to cross-examine witnesses. Although Willis complains it was not permitted to cross-examine an expert witness (Charles Binder), the record shows they *did* extensively cross-examine him. Willis, apparently conceding they were not "completely denied the fundamental right to cross-examine [Binder]" (*ibid*.), contends instead that the trial court erred in sustaining objections to many of the questions Willis put to Binder. However, Willis does not mention either the questions or the objections, much less carry its appellate burden of showing the rulings on the objections were an abuse of discretion. Because we must presume the objections were properly sustained (see generally *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1526), we presume the court correctly ruled on the objections made during Willis's cross-examination of Binder.

Willis also complains of the inability to cross-examine the basis upon which two experts opined that the present uses of water by those receiving allocations were reasonable and beneficial uses of the available water. Willis argues that "[b]y precluding [Willis] from cross-examining information presented during Phase [4] of trial, … the

court denied [Willis] a fair trial." We reject this argument because it conflates what was and was not determined in the Phase 4 and 6 trials. During the Phase 4 trial, parties presented evidence of their current groundwater pumping (for the years 2011 and 2012), and the court made findings of facts of the amounts of groundwater pumped by each party who participated in that phase of the trial. The court made clear its findings were limited to the amount of groundwater production and did not determine water rights or the reasonableness of any party's water use. In Phase 6, two experts then testified (based on those established pumping numbers) that the amounts pumped and the ostensible purposes for which those amounts were used were reasonable and beneficial.

Willis, apparently objecting to the experts' reliance on the declarations and Phase 4 findings to reach their opinion on whether the pumping parties were reasonably and beneficially using the pumped amounts, argued they needed to review over a hundred declarations in order to challenge the underlying evidence, "includ[ing] not only [the amount of ] pumping but the use by the parties." (Capitalization omitted.) The court stated it would not require every party who submitted declarations to come in and undergo cross-examination "unless you've reviewed the declarations and determined that there's a basis for challenging the use of their water on the land that they're using." (Capitalization omitted.) While it made no determination in Phase 4 beyond the amounts historically pumped, the court noted it had reviewed all of the declarations as part of making that determination and there are "very few that indicate any usage of water other than for crops, household use, the type of water usage that is on the land and is reasonable and beneficial to the land" and therefore "the court has a sense that you're not talking about hundreds, you're talking about very few that you're probably going to have to cross-examine." (Capitalization omitted.)

Willis cites nothing in the record suggesting that, after the court invited them to examine and determine whether there were any declarations warranting cross-examination as to the stated uses for the water pumped by the various parties, Willis

found (but was subsequently denied the opportunity to present) relevant cross-examination that would undermine the information ultimately relied on by the experts. Indeed, Willis *did* cross-examine one party who was involved in the Phase 4 determinations and declined the opportunity to cross-examine testimony on pumping amounts and uses that had not been previously presented and admitted in prior trial phases.

Beeby and Wagner ultimately opined most parties who proved their historical pumping from the basin (1) had identified uses served by that pumping which were recognized beneficial uses and (2) employed amounts of water for such uses that were within reasonable parameters. The court found, based on *this* testimony, the parties' historical pumping (as found in Phase 4) was being applied to reasonable and beneficial uses. Willis was not denied the opportunity to cross-examine the experts' opinion (expressed during the Phase 6 trial) that the parties' stated uses were beneficial uses, nor was Willis denied the opportunity to cross-examine the experts on whether the amounts historically pumped for such stated uses were outside of recognized and reasonable parameters for such uses.[28] We conclude Willis was not denied a meaningful opportunity to cross-examine the testimony critical to the court's assessment of whether the overliers' allotments satisfied the constitutional mandate that available water be used reasonably and beneficially. We therefore reject Willis's claims the court's evidentiary rulings denied them their due process rights.

---

[28]Willis does assert it was constricted in cross-examining Beeby because, when Willis's counsel asked whether Beeby did "any evaluation of one party's use relative to another party's use and determine whether or not it's reasonable to have that particular use" (capitalization omitted), the court sustained an objection to that inquiry. However, Willis does not explain on appeal why this question was proper or how the ruling was error, and we therefore presume the ruling sustaining the objection was proper. (*In re Marriage of Davenport*, *supra*, 194 Cal.App.4th at p. 1526.) Willis also complains the court sustained an objection to a question, posed to Binder, whether it was "important to [his] expert opinion whether a groundwater right is given on a permanent or a non-permanent basis in the given physical solution." (Capitalization omitted.) Again, Willis does not explain on appeal why this question was proper or why the court's ruling on the objection was error.

# X

## CONCLUSION

The trial court was required to find a Physical Solution that balanced the needs of thousands of existing users, all of whom competed for the scarce water that replenished the aquifer underlying the AVAA, and to craft its provisions to protect the long-term health of the aquifer and the region's residents. The court determined that severely reduced water usage was required of existing users, and that severely curtailed access was required for future users. We conclude the measures selected in the final Physical Solution did not violate California's water law principles, were consistent with the Settlement, were not an abuse of the trial court's discretion to construct a fair and just allocation of the available water, and Willis was afforded an adequate notice and opportunity to present its contentions as part of the lengthy process of crafting the final Physical Solution. Accordingly, we affirm the judgment as to Willis.

All parties are to bear their own costs on appeal.

PEÑA, Acting P.J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.

85.

Filed 4/6/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANTELOPE VALLEY GROUNDWATER CASES[*] | F082469 |
| REBECCA LEE WILLIS et al., | |
| Plaintiffs and Appellants, | (JCCP No. 4408) |
| v. | |
| LOS ANGELES COUNTY WATERWORKS DISTRICT NO. 40 et al., | |
| Defendants, Cross-complainants and Respondents; | |
| CITY OF LOS ANGELES et al., | |
| Defendants, Cross-defendants and Respondents; | |
| ANTELOPE VALLEY–EAST KERN WATER AGENCY, | |
| Cross-defendant, Cross-complainant and Respondent; | |

---

[*]*Los Angeles County Waterworks District No. 40 v. Diamond Farming Co.* (Super. Ct. Los Angeles County, No. BC325201); *Los Angeles County Waterworks District No. 40 v. Diamond Farming Co.* (Super. Ct. Kern County, No. S-1500-CV254348); *Wm. Bolthouse Farms*, *Inc. v. City of Lancaster* (Super. Ct. Riverside County, No. RIC353840); *Diamond Farming Co. v. City of Lancaster* (Super. Ct. Riverside County, No. RIC344436); *Diamond Farming Co. v. Palmdale Water Dist.* (Super. Ct. Riverside County, No. RIC344668); *Willis v. Los Angeles County Waterworks District No. 40* (Super. Ct. Los Angeles County, No. BC364553); *Wood v. Los Angeles County Waterworks District No. 40* (Super. Ct. Los Angeles County, No. BC391869).

U. S. BORAX INC. et al.,

     Cross-defendants and Respondents.

Appellants' petition for rehearing filed in the above-entitled case on April 2, 2021, is hereby denied.

As the nonpublished opinion filed on March 16, 2021, in the above matter meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

                                        PEÑA, Acting P.J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.

2.